John A. Vogt (State Bar No. 198677)
JONES DAY
3161 Michelson Drive, Suite 800
Irvine, CA  92612
(T) 949-851-3939
(F) 949-553-7539
javogt@jonesday.com

Attorneys for Defendant
Experian Information Solutions, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELETTRA MEEKS, JOSEPH DELACRUZ, STEPHANIE LAGUNA, AMBER LEONARD, and BECKY WITT, on behalf of themselves and others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.: MIDWEST RECOVERY SYSTEMS, LLC; and CONSUMER ADJUSTMENT COMPANY, INC.,<br><br>    Defendants. | Case No. 3:21-cv-03266-VC<br><br>Assigned to: Judge Vince Chhabria<br><br>**EXPERIAN INFORMATION SOLUTIONS, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**[SUPPORTING DECLARATION OF DAVID WILLIAMS AND [PROPOSED] ORDER FILED UNDER SEPARATE COVER]**<br><br>Date: July 29, 2021<br>Time: 10:00 a.m.<br>Place: Courtroom 4 |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 2

    I.      SUMMARY OF THE FACTS .............................................................................. 2

    II.     PLAINTIFFS AGREED TO THE TERMS OF USE ........................................... 3

         A.     Plaintiff Electtra Meeks ........................................................................... 3

         B.     Plaintiff Amber Leonard ......................................................................... 4

         C.     Plaintiff Stephanie Laguna ...................................................................... 4

         D.     Plaintiff Becky Witt ................................................................................. 5

         E.     Plaintiff Joseph De La Cruz ..................................................................... 5

    III.    PLAINTIFFS AGREED TO ARBITRATE THEIR CLAIMS ............................ 6

    IV.    PLAINTIFFS' CLAIMS ARE SUBJECT TO ARBITRATION ........................ 11

LEGAL ARGUMENT ...................................................................................................... 11

    I.      THE COURT SHOULD COMPEL THIS MATTER TO ARBITRATION ........ 11

         A.     Plaintiffs' Claims Are Subject To Binding Arbitration ........................... 12

         B.     A Valid Agreement to Arbitrate Exists .................................................... 13

         C.     Plaintiffs' Claims Fall Within The Broadly-Worded Scope Of The
               Arbitration Clause ................................................................................... 16

    II.     THE ACTION MUST BE STAYED PENDING ARBITRATION .................... 19

CONCLUSION ................................................................................................................. 20

# <u>TABLE OF AUTHORITIES</u>

**Page**

**CASES**

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983) ........................................................................................................13

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011) .....................................................................................................12

*AT&T Tech, Inc. v. Communications Workers of America*,
   475 U.S. 643 (1986) ...............................................................................................13, 18

*Buckeye Check Cashing, Inc. v. Cardegna*,
   546 U.S. 440 (2006) .....................................................................................................12

*Chiron Corp. v. Ortho Diagnostic Systems, Inc.*,
   207 F.3d 1126 (9th Cir. 2000).......................................................................13, 17, 18

*Collins & Aikman Products Co. v. Building Systems, Inc.*,
   58 F.3d 16 (2nd Cir. 1995)...........................................................................................19

*Coulter v Experian Information Solutions, Inc.*,
   2021 WL 735726 (E.D. Pa. Feb. 25, 2021)...........................................2, 14, 16, 17

*Crawford v. Beachbody, LLC*,
   No. 14cv1583-GPC(KSC), 2014 WL 6606563 (S.D. Cal. Nov. 5, 2014) ...............15

*Gillette v. First Premier Bank*,
   No. 3:13-CV-432-LAB-RBB, 2013 WL 3205827 (S.D. Cal. June 24, 2013) .........17

*Graf v. Match.com, LLC*,
   No. CV 15-3911 PA, 2015 WL 4263957 (C.D. Cal. July 10, 2015) ........................15

*Green Tree Fin. Corp.-Ala. v. Randolph*,
   531 U.S. 79 (2000)........................................................................................................13

*Henry Schein, Inc. v. Archer and White Sales, Inc.*,
   U.S., 139 S.Ct. 524 (2019)...........................................................................................17

*In re Remicade (Direct Purchaser) Antitrust Litigation*,
   938 F.3d 515 (3rd Cir. 2019) ......................................................................................18

*Lee v. Ticketmaster, LLC*,
    2019 WL 9096442 (N.D. Cal. April 1, 2019) .......................................................................14

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985) ........................................................................................................13, 18

*Nguyen v. Barnes & Noble, Inc.*,
    763 F.3d 1171 (9th Cir. 2014).................................................................................................13

*Perry v. Thomas*,
    482 U.S. 483 (1987) ...............................................................................................................13

*Rent-A-Center W., Inc. v. Jackson*,
    130 S. Ct. 2772 (2010) ...........................................................................................................17

*Shearson/Am. Express v. McMahon*,
    482 U.S. 220 (1987) ...............................................................................................................13

*Swift v. Zynga Game Network, Inc.*,
    805 F. Supp. 2d 904 (N.D. Cal. 2011) ...................................................................................15

*Volt Info. Scis., Inc. v. Bd. of Tr. of Leland Stanford Junior Univ.*,
    489 U.S. 468 (1989) ...............................................................................................................13

*Willey v. J.P. Morgan Chase, N.A.*,
    No. 09 Civ. 1397(CM), 2009 WL 1938987 (S.D.N.Y. July 7, 2009).....................................19

MOTION TO COMPEL ARBITRATION

1

## NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION

2    **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD, PLEASE TAKE**

3    **NOTICE THAT**, on July 29, 2021, at 10:00 a.m. in Courtroom 4 of the above-referenced Court,

4    located at 450 Golden Gate Avenue, San Francisco, CA 94102, the Honorable Vince Chhabria

5    presiding, defendant Experian Information Solutions, Inc. will, and hereby does, move this Court

6    for an Order, pursuant to section 4 of the Federal Arbitration Act, 9 U.S.C. §§ 1-16, compelling all

7    claims against Experian to individual arbitration and staying this action until arbitration has

8    been completed.

9        The Motion is based upon this Notice of Motion and Motion, the attached Memorandum of

10   Points and Authorities, the accompanying Declaration of David Williams, all of the papers on file

11   in this action, and upon such other and further evidence or argument that the Court may consider.

12

13   Dated:  June 25, 2021                                JONES DAY

14

15                                                       By: _____
                                                             John A. Vogt

16                                                       Attorneys for Defendant
17                                                       Experian Information Solutions, Inc.

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

In support of its Motion to Compel Arbitration, defendant Experian Information Solutions, Inc. ("EIS") respectfully submits the following Memorandum of Points and Authorities.

**INTRODUCTION**

This is a putative class action under the Fair Credit Reporting Act.  There are five named plaintiffs: Electtra Meeks, Joesph De La Cruz, Stephanie Laguna, Amber Leonard, and Becky Witt.  Collectively, they generally allege the following.  They each obtained loans from what they contend are "tribal lenders."  They contend that those loans were illegal under state law.  They ceased paying on the loans, and the debts became delinquent.  The loans, the payment histories, and delinquency information were reported by the lenders to EIS.  They maintain that a class action settlement should have put EIS on notice that their loans were illegal, and should have ceased reporting on their credit files (even though EIS was not a party to that case).  After Plaintiffs disputed the loans, EIS deleted them from their files.  Nonetheless, they contend that the loans were subsequently purchased by third parties—defendants Midwest Recovery Systems, LLC and Consumer Adjustment Company, Inc.—who continued to report the loans to EIS and allegedly altered the "date of first delinquency."  That adjustment, Plaintiffs say, made the delinquency of their loans appear to be more recent than they actually were, and prevented the debt from aging off their files in a timely manner.  Plaintiffs contend that EIS's actions constituted a willful violation of the FCRA.  EIS now moves to compel Plaintiffs' claims to arbitration.

Each Plaintiff is a member of CreditWorks℠—a free online credit monitoring product that is provided by EIS's affiliate, ConsumerInfo.com, Inc. (which does business as Experian Consumer Services ("ECS")).  Each of Plaintiffs' CreditWorks℠ membership predates the filing of this lawsuit.  Plaintiffs' CreditWorks℠ memberships afforded them access to how credit information appeared in their EIS credit files.  Each Plaintiff used their CreditWorks℠ membership, logging on to the service and accessing the information in their file at EIS before and after this lawsuit was filed.  Through the use of their memberships, Plaintiffs learned the facts giving rise to their claims in this case, including how the loans at issue were being reported and the alleged changes to the "date of first delinquency."

MOTION TO COMPEL ARBITRATION

When Plaintiffs enrolled in CreditWorks℠, they agreed to the Terms of Use governing that service. The Terms of Use has an arbitration clause, which provides that Plaintiffs and ECS—as well as ECS's affiliate, defendant EIS—agree to arbitrate "all disputes and claims between us" that "aris[e] out of or relat[e] to" Plaintiffs' use of their CreditWorks℠ subscription. Even though the Terms of Use delegate all questions of arbitrability to an arbitrator, Plaintiffs' claims fall within the scope of the arbitration clause, as they "aris[e] out of or relat[e] to" their use of CreditWorks℠. In the recent *Coulter v. Experian* decision, the Honorable Nitza I. Quiñones Alejandro granted EIS's motion to compel arbitration, upholding the validity and enforceability of the arbitration clause in the ***same*** Terms of Use at issue here. *See Coulter v Experian Information Solutions, Inc.*, 2021 WL 735726 (E.D. Pa. Feb. 25, 2021). This Court should now do the same.

Thus, under the Federal Arbitration Act, 9 U.S.C. § 1, et seq., EIS respectfully moves for an order compelling this matter to arbitration, as required under Plaintiffs' written agreement, and staying this action until arbitration has been completed.

## STATEMENT OF FACTS

### I.   SUMMARY OF THE FACTS

Over various points in time, each of the Plaintiffs enrolled in CreditWorks℠. (*See* Declaration of David Williams (Williams Decl.), ¶¶ 3, 9, 14, 19, and 25.) At the time of enrollment, each Plaintiff agreed to bound by the Terms of Use governing their subscription. (*Id.*, ¶¶ 3-4, 9-10, 14-15, 19-20, and 25.) Every version of the Terms of Use that was in effect when each Plaintiff enrolled had an arbitration clause, which required Plaintiffs to litigate, among other things, all claims against EIS that "relate to" or "arise out of" their membership in non-class arbitration. (*Id.*, Exs. 3, 5, 6, 9, 12, 13 and 15.) Furthermore, every version of the Terms of Use that was in effect when each Plaintiff enrolled had an amendment clause, which provides that the Plaintiffs agreed to be bound by the then-current version of the Terms of Use every time they used their membership. (*Id.*) After enrolling, every Plaintiff continuously has used their membership, including after the current version of the Terms of Use came into effect, thereby binding them to that agreement. (*Id.*, ¶¶ 6, 11, 16, 22 and 26.) The current version of the Terms of Use, like all of the versions before it, has an arbitration clause, which requires Plaintiffs to litigate all of the claims they plead in this case

MOTION TO COMPEL ARBITRATION

in non-class arbitration.  (*Id.*, Ex. 6.)  Like all prior versions of the Terms of Use, the current version expressly allows EIS to invoke and enforce the arbitration clause.  (*Id.*)  And, like all prior versions of the Terms of Use, the current version broadly delegates all questions regarding arbitrability to an arbitrator to decide.  (*Id.*)

## II.     PLAINTIFFS AGREED TO THE TERMS OF USE

### A.     Plaintiff Electtra Meeks

On November 2, 2018, Ms. Meeks enrolled in CreditWorks℠.  (*Id.*, ¶ 3.)  In order to do so, Ms. Meeks had to complete two webforms.  (*Id.*)  The first form required Ms. Meeks to enter her personal information—*i.e.*, her name, address, phone number, and e-mail address.  (*Id.*, ¶ 3 and Ex. 1.)  After she did so, Ms. Meeks had to click the "Submit and Continue" button on the form to continue with the enrollment process.  (*Id.*)  Ms. Meeks clicked the "Submit and Continue" button, and was presented with a second form to complete.  (*Id.*)  That form required Ms. Meeks to enter her social security number, date of birth, and a username and password.  (*Id.*, ¶ 4.)  Immediately below the boxes to enter and confirm her password, was the following disclosure:  "By clicking "Submit Secure Order": I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy and Ad Targeting Policy."  (*Id.*, ¶ 4 and Ex. 2.)  Immediately below the disclosure was a large purple button that reads:  "Submit Secure Order."



 (*Id.*)  The webform, the disclosure, and the "Submit Secure Order" button appeared on a single webpage.  (*Id.*)  After entering her information, Ms. Meeks clicked the "Submit Secure Order" order button, thereby accepting and agreeing to the Terms of Use.  (*Id.*)  A true and correct copy of

MOTION TO COMPEL ARBITRATION

the Terms of Use that was in effect when Ms. Meeks enrolled is attached as Exhibit 3 to the Williams Declaration.  After enrolling, Ms. Meeks continuously used her service, including after the current version of the Terms of Use came into effect.  (*Id.*, ¶ 6.)[1]

**B.      Plaintiff Amber Leonard**

On June 1, 2019, Ms. Leonard enrolled in CreditWorksᔆᔅ.  (*Id.*, ¶ 9.)  In order to do so, Ms. Leonard had to complete the same two webforms that Ms. Meeks completed.  (*Id.* and Exs. 7 and 8.)  Like Ms. Meeks, Ms. Leonard entered her personal information, and clicked the "Submit and Continue" button on the first form to continue with the enrollment process.  (*Id.*, ¶ 9)  After she clicked the "Submit and Continue" button, she was presented with, and completed, the second form.  (*Id.*, ¶ 10 and Ex. 8.)  After entering her information, Ms. Leonard clicked the "Submit Secure Order" order button, thereby accepting and agreeing to the Terms of Use Agreement.  (*Id.*)  A true and correct copy of the Terms of Use that was in effect when Ms. Leonard enrolled is attached as Exhibit 9 to the Williams Declaration.  After enrolling, Ms. Leonard continuously used her service, including after the current version of the Terms of Use came into effect.  (*Id.*, ¶ 11.)

**C.      Plaintiff Stephanie Laguna**

On May 2, 2019, Ms. Laguna enrolled in CreditWorksᔆᔅ.  (*Id.*, ¶ 14.)  In order to do so, Ms. Laguna had to complete the same two webforms that Ms. Meeks and Ms. Leonard completed.  (*Id.* and Exs. 7 and 8.)  Like her co-plaintiffs, Ms. Laguna entered her personal information, and clicked the "Submit and Continue" button on the first form to continue with the enrollment process.  (*Id.*)  After she clicked the "Submit and Continue" button, she was presented with, and completed, the second form.  (*Id.*, ¶ 15 and Ex. 8.)  After entering her information, Ms. Laguna clicked the "Submit Secure Order" order button, thereby accepting and agreeing to the Terms of Use Agreement.  (*Id.*)  A true and correct copy of the Terms of Use that was in effect when Ms. Laguna enrolled is attached as Exhibit 9 to the Williams Declaration.   After enrolling, Ms. Laguna

---

[1] On July 11, 2020, Ms. Meeks activated the "Boost" feature on her account.  (*Id.*, ¶ 5.) In order to do so, Ms. Meeks was required re-affirm her consent to the Terms of Use.  (*Id.*, and Ex. 4) The Terms of Use that she re-affirmed are those that are attached as Exhibit 5 to the Williams Declaration.

MOTION TO COMPEL ARBITRATION

continuously used her service, including after the current version of the Terms of Use came into effect.  (*Id*., ¶ 16.)

### D.    Plaintiff Becky Witt

On October 23, 2016, Ms. Witt enrolled in CreditWorks℠.  (*Id*., ¶ 19.)  In order to do so, Ms. Witt had to complete two webforms.  (*Id*. and Exs. 10 and 11.)  Like her co-plaintiffs, Ms. Witt entered her personal information, and clicked the "Submit and Continue" button on the first form to continue with the enrollment process.  (*Id*.)  After she clicked the "Submit and Continue" button, she was presented with, and completed, the second form.  (*Id*., ¶ 20 and Ex. 11.)  After entering her information, Ms. Witt clicked the "Submit Secure Order" order button, thereby accepting and agreeing to the Terms of Use Agreement.  (*Id*.)  A true and correct copy of the Terms of Use that was in effect when Ms. Witt enrolled is attached as Exhibit 12 to the Williams Declaration.  After enrolling, Ms. Witt continuously used her service, including after the current version of the Terms of Use came into effect.  (*Id*., ¶ 22.)[2]

### E.    Plaintiff Joseph De La Cruz

On August 28, 2020, Mr. De La Cruz enrolled in CreditWorks℠.  (*Id*., ¶ 25.)  In order to successfully enroll, Mr. De La Cruz had to complete a single webform.  (*Id*.)  The form required Mr. De La Cruz to enter his personal information—*i.e.*, his name, address, phone number, and e-mail address.  (*Id*. and Ex. 14.)  After he entered his personal information, Mr. De La Cruz had to click the "Create Your Account" button on the webform in order to enroll.  (*Id*.)  Immediately below the boxes to enter his e-mail address and password, was the following disclosure: "By clicking "Create Your Account": I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy and Ad Targeting Policy."  (*Id*.)  Immediately below the disclosure was a large purple button that reads:  "Create Your Account."  The webform, the disclosure, and the "Create Your Account" button appeared on a single webpage.  (*Id*.)  After

---

[2] On March 3, 2019, Ms. Witt activated the "Boost" feature on her account.  (*Id*., ¶ 21.) In order to do so, Ms. Witt was required re-affirm her consent to the Terms of Use.  (*Id*. and Ex. 4.) The Terms of Use that she re-affirmed are those that are attached as Exhibit 13 to the Williams Declaration.

MOTION TO COMPEL ARBITRATION

entering his information, Mr. De La Cruz clicked the "Create Your Account" button, thereby accepting and agreeing to the Terms of Use Agreement.  (*Id*.)  A true and correct copy of the Terms of Use that was in effect when Mr. De La Cruz enrolled is attached as Exhibit 15 to the Williams Declaration.  After enrolling, Mr. De La Cruz continuously used his service, including after the current version of the Terms of Use came into effect.  (*Id*., ¶ 26.)

## III.   <u>PLAINTIFFS AGREED TO ARBITRATE THEIR CLAIMS</u>

The Terms of Use in effect when each Plaintiff enrolled had a section entitled, "Amendments," which advised them that they would be bound by the then-current Terms of Use each time they "order[ed], access[ed], or use[d]" any of the Services or Websites described in the agreement.  (*Id*., Exs. 3, 5, 6, 9, 12, 13 and 15.)  Every subsequent version of the Terms of Use has the identical section on Amendments, including the current version.  (*Id*., Ex. 6.)  While all versions of the Terms of Use allowed Plaintiffs to opt-out of amendments to the arbitration clause, *see id*., Exs. 3, 5, 6, 9, 12, 13 and 15, at no time did any of the Plaintiffs ever reject any changes that were made.  (*Id*., ¶¶ 7, 12, 17, 23 and 27.)   After they enrolled in CreditWorks, each of the Plaintiffs continuously used their Service and the Websites—including throughout 2021—which binds them to the current version of the Terms of Use Agreement.  (*Id*., ¶ 6, 11, 16, 22 and 26.)

The current (operative) version of the Terms of Use Agreement begins with the section, "Overview and Acceptance of Terms," which reads, in pertinent part:

> **OVERVIEW AND ACCEPTANCE OF TERMS**
>
> You agree that by creating an account with ECS (as defined below), or accessing or using our Services (as defined below), website(s) (such as this website, https://usa.experian.com, or any affiliated website (including, but not limited to, **Experian.com, FreeCreditReport.com, FreeCreditScore.com, CreditReport.com, Creditchecktotal.com, CreditScore.com, usa.experian.com, and experian.experiandirect.com**)), or mobile applications (such as the Experian app), as well as any content provided or accessible in connection with the website(s) or mobile application(s), including information, user interfaces, source code, reports, images, products, services, and data (each website and mobile application referred to herein as a "Website," and collectively, as "Websites"), you represent to ECS that you have read, understood, and expressly consent and agree to be bound by this Terms of Use Agreement, and the terms, conditions, and notices contained or

MOTION TO COMPEL ARBITRATION

referenced herein ("Agreement") whether you are a "Visitor" (which means that you simply browse or access a Website), or a "Customer" (which means that you have created an account with ECS, or enrolled or registered with a Website, or are accessing or using a Service).

\*          \*          \*

For the avoidance of doubt, this Agreement expressly applies to: (a) your access to and use of the Websites; (b) any and all transactions between you and ECS through the Websites, including for the provision of any Services or of any credit, personal, financial or other information delivered as part of or in conjunction with free Services or paid Services, including any such information that may be archived to the extent made available on the Websites, such as (i) for your purchase of non-membership based Services such as the 3 Bureau Credit Report and FICO® Scores, the FICO Industry or other Base FICO Scores and/or an Experian Credit Report and FICO Score, (ii) enrollment and use of free Services (such as EXPERIAN CREDITWORKS℠ Basic), and/or enrollment, purchase and use of membership based Services (such as EXPERIAN CREDITWORKS℠ Premium, Experian IdentityWorks℠, or Experian Credit Tracker℠); and (iii) your access to and use of calculators, credit resources, text, pictures, graphics, logos, button items, icons, images, works of authorship and other information and all revisions, modifications, and enhancements thereto contained in the Websites.

You may not browse the Websites, or create an account or register with ECS, or use or enroll in any Services, and you may not accept this Agreement, if you are not of a legal age to form a binding contract with ECS. If you accept this Agreement, you represent that you have the capacity to be bound by it. Before you continue, you should print or save a local copy of this Agreement for your records.

**THE SERVICES AND WEBSITES ARE SUBJECT TO ALL TERMS AND CONDITIONS CONTAINED HEREIN AND ALL APPLICABLE LAWS AND REGULATIONS. PLEASE READ THIS AGREEMENT CAREFULLY. YOUR ACCEPTANCE OF, ORDER OF, USE OF, AND/OR ACCESS TO, THE SERVICES AND WEBSITES CONSTITUTES YOUR AGREEMENT TO ABIDE BY EACH OF THE TERMS AND CONDITIONS SET FORTH HEREIN. IF YOU DO NOT AGREE WITH ANY OF THESE TERMS OR CONDITIONS, DO NOT USE, ACCESS OR ORDER ANY SERVICE OR ACCESS OR USE THE WEBSITES. IF YOU HAVE ALREADY BEGUN ACCESSING OR USING THE SERVICES AND/OR WEBSITES AND DO NOT AGREE TO BE BOUND BY THIS AGREEMENT, IMMEDIATELY CEASE USING THE SERVICE OR WEBSITE AND/OR DISCARD ANY INFORMATION OR PRODUCTS YOU RECEIVED VIA ANY SERVICE OR WEBSITE (TO THE EXTENT APPLICABLE), AND CALL CUSTOMER CARE**

**AT 1-855-962-6943 TO CANCEL YOUR ACCOUNT WITH ECS. NOTE, YOU MAY ALSO BE ABLE TO DEACTIVATE YOUR PAID SERVICE AND RETAIN YOUR ACCOUNT WITH ECS ONLINE, AS AND TO THE EXTENT EXPLAINED IN FURTHER DETAIL BELOW.**

(*Id*., Ex. 6 (emphasis in original).)

The Terms of Use also has a section entitled "Dispute Resolution By Binding Arbitration" which reads, in pertinent part:

## DISPUTE RESOLUTION BY BINDING ARBITRATION

PLEASE READ THIS CAREFULLY. IT AFFECTS YOUR RIGHTS.

SUMMARY:

MOST CUSTOMER CONCERNS CAN BE RESOLVED QUICKLY AND TO THE CUSTOMER'S SATISFACTION BY CALLING ECS'S CUSTOMER CARE DEPARTMENT AT 1-855-962-6943. IN THE UNLIKELY EVENT THAT ECS'S CUSTOMER CARE DEPARTMENT IS UNABLE TO RESOLVE A COMPLAINT YOU MAY HAVE REGARDING A SERVICE OR WEBSITE TO YOUR SATISFACTION (OR IF ECS HAS NOT BEEN ABLE TO RESOLVE A DISPUTE IT HAS WITH YOU AFTER ATTEMPTING TO DO SO INFORMALLY), WE EACH AGREE TO RESOLVE THOSE DISPUTES THROUGH BINDING ARBITRATION OR SMALL CLAIMS COURT INSTEAD OF IN COURTS OF GENERAL JURISDICTION TO THE FULLEST EXTENT PERMITTED BY LAW. ARBITRATION IS MORE INFORMAL THAN A LAWSUIT IN COURT. ARBITRATION USES A NEUTRAL ARBITRATOR INSTEAD OF A JUDGE OR JURY, ALLOWS FOR MORE LIMITED DISCOVERY THAN IN COURT, AND IS SUBJECT TO VERY LIMITED REVIEW BY COURTS. ARBITRATORS CAN AWARD THE SAME DAMAGES AND RELIEF THAT A COURT CAN AWARD. ANY ARBITRATION UNDER THIS AGREEMENT WILL TAKE PLACE ON AN INDIVIDUAL BASIS; CLASS ARBITRATIONS AND CLASS ACTIONS ARE NOT PERMITTED. ECS WILL PAY ALL COSTS OF ARBITRATION, NO MATTER WHO WINS, SO LONG AS YOUR CLAIM IS NOT FRIVOLOUS. HOWEVER, IN ARBITRATION, BOTH YOU AND ECS WILL BE ENTITLED TO RECOVER ATTORNEYS' FEES FROM THE OTHER PARTY TO THE SAME EXTENT AS YOU WOULD BE IN COURT.

Arbitration Agreement:

(a) ECS and you agree to arbitrate all disputes and claims between us arising out of this Agreement directly related to the Services or Websites to the

MOTION TO COMPEL ARBITRATION

maximum extent permitted by law, except any disputes or claims which under governing law are not subject to arbitration. This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us directly relating to the provision of any Service and/or your use of any Website subject to arbitration to the fullest extent permitted by law. The agreement to arbitrate includes, but is not limited to:

claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website, whether based in contract, tort, statute (including, without limitation, the Credit Repair Organizations Act) fraud, misrepresentation or any other legal theory; claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising); claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and claims that may arise after the termination of this Agreement.

For purposes of this arbitration provision, references to "ECS," "you," and "us" shall include our respective parent entities, subsidiaries, affiliates (including, without limitation, our service provider, CSID), agents, employees, predecessors in interest, successors and assigns, websites of the foregoing, as well as all authorized or unauthorized users or beneficiaries of Services and/or Websites or information under this or prior Agreements between us relating to Services and/or Websites. Notwithstanding the foregoing, either party may bring an individual action in small claims court. You agree that, by entering into this Agreement, you and ECS are each waiving the right to a trial by jury or to participate in a class action to the maximum extent permitted by law. This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this arbitration provision. This arbitration provision shall survive termination of this Agreement.

*          *          *

(c) . . . The arbitration will be governed by the Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by this Agreement, and will be administered by the AAA. If the AAA is unavailable or refuses to arbitrate the parties' dispute for any reason, the arbitration shall be administered and conducted by a widely-recognized arbitration organization that is mutually agreeable to the parties, but neither party shall unreasonably withhold their consent. If the parties cannot agree to a mutually agreeable arbitration organization, one shall be appointed pursuant to Section 5 of the Federal Arbitration Act. In all events, the AAA Rules shall govern the parties' dispute. The AAA Rules are available online at www.adr.org, by calling the AAA at 1-800-778-7879, or by writing to the Notice Address. The AAA Rules may change from time to time, and you should review them periodically.

MOTION TO COMPEL ARBITRATION

1

2       All issues are for the arbitrator to decide, including the scope and
        enforceability of this arbitration provision as well as the Agreement's other
3       terms and conditions, and the arbitrator shall have exclusive authority to
        resolve any such dispute relating to the scope and enforceability of this
4       arbitration provision or any other term of this Agreement including, but not
        limited to any claim that all or any part of this arbitration provision or
5       Agreement is void or voidable. However if putative class or representative
        claims are initially brought by either party in a court of law, and a motion to
6       compel arbitration is brought by any party, then the court shall have the
        power to decide whether this agreement permits class or representative
7       proceedings. The arbitrator shall be bound by the terms of this Agreement
        and shall follow the applicable law. In this regard, the arbitrator shall not
8       have the power to commit errors of law or legal reasoning, and any award
        rendered by the arbitrator that employs an error of law or legal reasoning
9       may be vacated or corrected by a court of competent jurisdiction for any such
        error. Unless ECS and you agree otherwise, any arbitration hearings will take
10      place in the county (or parish) of your billing address. If your claim is for
        $10,000 or less, we agree that you may choose whether the final arbitration
11      hearing will be conducted solely on the basis of documents submitted to the
        arbitrator, through a telephonic hearing, or by an in-person hearing as
12      established by the AAA Rules. If your claim exceeds $10,000, the right to a
        hearing will be determined by the AAA Rules. Except as otherwise provided
13      for herein, ECS will pay all AAA filing, administration and arbitrator fees
        for any arbitration initiated in accordance with the notice requirements
14      above. If, however, the arbitrator finds that either the substance of your claim
        or the relief sought in the Demand is frivolous or brought for an improper
15      purpose (as measured by the standards set forth in Federal Rule of Civil
        Procedure 11(b)), then the payment of all such fees will be governed by the
16      AAA Rules. In such case, you agree to reimburse ECS for all monies
        previously disbursed by it that are otherwise your obligation to pay under
17      the AAA Rules.

18                              *       *       *

19      (f) YOU AND ECS AGREE THAT EACH MAY BRING CLAIMS
20      AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL
        CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN
21      ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.
        Further, unless both you and ECS agree otherwise, the arbitrator may not
22      consolidate more than one person's claims, and may not otherwise preside
23      over any form of a representative or class proceeding. The arbitrator may
        award injunctive relief only in favor of the individual party seeking relief
24      and only to the extent necessary to provide relief warranted by that party's
        individual claim. If this specific subparagraph (f) is found to be
25      unenforceable in its entirety, then the entirety of this arbitration provision
26      shall be null and void. However, if only a portion of this subparagraph (f) is
        found to be unenforceable, then the unenforceable portion of the provision
27      shall be stricken, and the remainder of subparagraph (f) enforced. Any

28

                                    - 10 -

1
2

> claims not subject to individual arbitration under applicable law shall be
> stayed in a court of competent jurisdiction pending completion of the
> individual arbitration.

3

(*Id.*, Ex. 6 (emphasis in original).)

4

## IV.    PLAINTIFFS' CLAIMS ARE SUBJECT TO ARBITRATION

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

Plaintiffs allege that each obtained loans from what they contend are "tribal lenders." (ECF No. 1 at ¶ 1.)  They allege that those loans were illegal under state law.  (*Id.*)  They ceased paying on the loans, and the debts became delinquent.  (*Id.*, ¶¶ 62-63, 65-66, 69-70, 77-78 and 85-86.) The loans, the payment histories, and delinquency information were reported by the lenders to EIS. (*Id.*)  They maintain that a class action settlement should have put EIS on notice that their loans were illegal, and should have ceased reporting on their credit files—even though EIS was not a party to the case and the settlement imposed no reporting obligation on the part of the settling defendants to EIS.  (*Id.*, ¶ 7.)  After Plaintiffs disputed the loans, EIS deleted them from their files. (*Id.*, ¶ 62, 73 and 81.)  Nonetheless, they contend that the loans were subsequently purchased by third parties, who not only continued to report the loans to EIS but allegedly altered the "date of first delinquency."  (*Id.*, ¶ 6, 51.)  That adjustment, Plaintiffs say, made the delinquency of their loans appear to be more recent than they actually were, and prevented the debt from aging off their files in a timely manner.  (*Id.*)  Through their CreditWorks subscription, Plaintiffs learned how EIS was reporting the loans and "date of first delinquency" that is the subject of this lawsuit.  (Williams Decl., ¶¶ 8, 13, 18, 24 and 28.)

20
21

## LEGAL ARGUMENT

## I.    THE COURT SHOULD COMPEL THIS MATTER TO ARBITRATION

22
23
24
25
26

The FAA provides that "[a] party aggrieved by the alleged failure … of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction . . . of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.

27
28

MOTION TO COMPEL ARBITRATION

This Court should issue an order compelling this matter to arbitration because the Terms of Use Agreement is an enforceable contract that broadly encompasses "all disputes and claims between [Plaintiffs and Experian] arising out of this Agreement directly related to the Services or Websites to the maximum extent permitted by law, except any disputes or claims which under governing law are not subject to arbitration." (Williams Decl., Exs. 3, 5, 6, 9, 12, 13 and 15.) It further provides that "[t]his agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us directly relating to the provision of any Service and/or your use of any Website subject to arbitration to the fullest extent permitted by law." (*Id*.)  It also provides that "[t]he agreement to arbitrate includes, but is not limited to:  claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website, whether based in contract, tort, statute (including, without limitation, the Credit Repair Organizations Act) fraud, misrepresentation or any other legal theory; claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising); claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and claims that may arise after the termination of this Agreement." (*Id*.)

### A.    Plaintiffs' Claims Are Subject To Binding Arbitration

Section 2 of the FAA mandates that binding arbitration agreements in contracts "evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  This provision "reflect[s] both a 'liberal federal policy favoring arbitration' and the 'fundamental principle that arbitration is a matter of contract,'" such that "courts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *see also Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) ("Section 2 [of the FAA] embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts.").

The FAA promotes a "liberal federal policy favoring arbitration agreements," and "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *Perry v. Thomas*, 482 U.S. 483, 490 (1987) (stating that arbitration agreements falling within the scope of the FAA "must be 'rigorously enforce[d]'" (citations omitted)). The FAA "requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." *Volt Info. Scis., Inc. v. Bd. of Tr. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989). The court "must resolve 'any doubts concerning the scope of arbitrable issues ... in favor of arbitration.'" *Moses H. Cone*, 460 U.S. at 24-25.

Pursuant to the FAA, arbitration must be compelled where, as here: (1) a valid agreement to arbitrate exists; and (2) the arbitration agreement encompasses the claims at issue. *See Chiron Corp. v. Ortho Diagnostic Systems, Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). An arbitration agreement governed by the FAA, like the arbitration agreement here, is presumed to be valid and enforceable. *See Shearson/Am. Express v. McMahon*, 482 U.S. 220, 226 (1987); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-27 (1985). Indeed, there is a presumption in favor of arbitrability. *AT&T Tech,, Inc. v. Communications Workers of America*, 475 U.S. 643, 650 (1986). The party seeking to evade arbitration bears the burden of showing that the arbitration provision is invalid or does not encompass the claims at issue. *See Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000). As demonstrated below, the arbitration clause in the Terms of Use Agreement is valid and, although the question of the arbitrability of Plaintiffs' claims ultimately is for an arbitrator to decide, the controversy between Plaintiffs and Experian clearly falls within the arbitration clause's broadly-worded scope.

### B.    A Valid Agreement to Arbitrate Exists

"While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393,

MOTION TO COMPEL ARBITRATION

403 (2d Cir. 2004).  Courts within this Circuit routinely enforce internet agreements where, as here, the user is required to affirmatively acknowledge the agreement before proceeding with use of the website.  *See*, *e.g.*, *Lee v. Ticketmaster, LLC*, 2019 WL 9096442, at *1 (N.D. Cal. April 1, 2019) (Chhabria, J.), aff'd 817 Fed. Appx. 393 (9th Cir. 2020) ("Ticketmaster provided notice of the terms of use adjacent to the 'Place Order' button, included a hyperlink to the terms in a contrasting color, and informed the user that "continuing past this page" (*i.e.*, placing an order) would indicate assent to the terms.").

As a matter of law, Plaintiffs agreed to the Terms of Use Agreement because:  (1) they had clear notice of the Terms of Use, (2) they were admonished immediately above the "Submit Secure Order" button that, "By clicking "Submit Secure Order": I accept and agree to your **Terms of Use Agreement**, as well as acknowledge receipt of your **Privacy Policy** and **Ad Targeting Policy**," and (3) they clicked the "Submit Secure Order" button, thereby manifesting their assent to the Terms of Use.[3]  Numerous courts, under indistinguishable facts, have found that website users were bound by the Terms of Use.

Indeed, in the recent *Coulter v. Experian* matter, Judge Alejandro granted Experian's motion to compel arbitration, upholding the validity and enforceability of the arbitration clause in the ***same*** Terms of Use Agreement at issue here.  *See Coulter*, 2021 WL 735726.  The court ruled that "reasonable notice was provided when Defendant's website advised Plaintiff that "**[b]y clicking 'Submit Secure Order': [He] accept[s] and agree[s] to [their] Terms of Use Agreement . . .**"  *Id.* at *5 (emphasis in original).  The court further found that "[t]he full Terms of Use Agreement, readily available to Plaintiff by clicking on the highlighted link, contained the Arbitration Provision entitled 'DISPUTE RESOLUTION BY BINDING ARBITRATION.'"  *Id.*  The court also explained that, "[b]y clicking the 'Submit Secure Order' button, Plaintiff manifested his assent to the Terms of Use Agreement."  *Id.*  In short,

---

[3] With regard to Mr. De La Cruz, the website similarly admonished him:  "By clicking "Create Your Account": I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy and Ad Targeting Policy."  (Williams Decl., ¶ 25 and Ex. 14.)

MOTION TO COMPEL ARBITRATION

"[b]ecause Plaintiff had reasonable notice and manifested his assent, . . . the Terms of Use Agreement and the Arbitration Provision therein constitute a valid agreement to arbitrate." *Id.* This Court should rule in the same manner.

Similarly, in *Graf v. Match.com, LLC*, No. CV 15-3911 PA (MRWx), 2015 WL 4263957 (C.D. Cal. July 10, 2015), the district court ruled that users of Match.com's website agreed to an arbitration provision in the Terms of Use "when they clicked on a 'Continue' or other similar button on the registration page where it was explained that by clicking on that button, the user was affirming that they would be bound by the Terms of Use, which were always hyperlinked and available for review." *Id.* at *4. Just as in *Graf*, the Terms of Use at issue here were expressly referenced and hyperlinked in the disclosure located immediately above the "Submit Secure Order" button; and the disclosure stated that by clicking the "Submit Secure Order" button, the online user was accepting the Terms of Use.

*Crawford v. Beachbody, LLC*, No. 14cv1583-GPC(KSC), 2014 WL 6606563 (S.D. Cal. Nov. 5, 2014), also is indistinguishable from the facts at hand. There, the district court found that the plaintiff had agreed to a forum selection clause found in a website's Terms and Conditions. Just like here, the plaintiff in *Crawford* "had to click an orange button that read 'PLACE ORDER.'" *Id.* at *3. Above the button the following text was presented to the plaintiff: "By clicking Place Order below, you are agreeing that you have read and understand the Beachbody Purchase Terms and Conditions, and Team Beachbody Terms and Conditions." *Id.* Just like here, "[t]he terms 'Terms [of] [Use]' were in blue font while the rest of the language in the sentence was in [black] font, which was hyperlinked to the full text of the Terms and Conditions." *Id.*

*Fteja v. Facebook* also is indistinguishable from the facts at hand. There, Facebook.com had disclosed: "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service." 841 F. Supp. 2d at 835. Plaintiffs likewise were warned: "By clicking "Submit Secure Order": I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy and Ad Targeting Policy." *See also Swift v.*

- 15 -

MOTION TO COMPEL ARBITRATION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911 (N.D. Cal. 2011) (enforcing Terms of Use because the plaintiff "was required to and did click on an 'Accept' button directly above a statement that clicking on the button served as assent to the [website's] terms of service along with a blue hyperlink directly to the terms of service").

The Terms of Use Agreement expressly allows affiliates of Experian Consumer Service to invoke the agreement's arbitration clause:

> For purposes of this arbitration provision, references to "ECS," "you," and "us" shall include our respective parent entities, subsidiaries, affiliates (including, without limitation, our service provider, CSID), agents, employees, predecessors in interest, successors and assigns, websites of the foregoing, as well as all authorized or unauthorized users or beneficiaries of Services and/or Websites or information under this or prior Agreements between us relating to Services and/or Websites.

(Williams Decl., Exs. 3, 5, 6, 9, 12, 13 and 15.)  Defendant Experian Information Solutions, Inc. is an affiliate of ECS.  (*Id*., ¶ 2.)

In sum, by disclosing to users they are agreeing to the Terms of Use, and requiring affirmative action by the user to assent to those terms, Plaintiffs are bound by the Terms of Use.  Hence, by clicking the "Submit Secure Order" button—or, in the case of Mr. De La Cruz, the "Create Your Account" button—Plaintiffs agreed to be bound by the then-current version of the Terms of Use Agreement, including its arbitration clause.  Thus, a valid agreement to arbitrate exists between Plaintiffs and Experian.  *See Coulter*, 2021 WL 735726 at *5.

### C.   Plaintiffs' Claims Fall Within The Broadly-Worded Scope Of The Arbitration Clause

If there is any question as to whether Plaintiffs' claims fall within the scope of the arbitration clause contained in the Terms of Use Agreement, that issue is to be decided by an arbitrator:

> ***All issues are for the arbitrator to decide***, including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement[.]

(Williams Decl., Exs. 3, 5, 6, 9, 12, 13 and 15 (emphasis added).)  Where, as here, the parties have

MOTION TO COMPEL ARBITRATION

clearly and unmistakably agreed that the arbitrator should decide the validity and applicability of an arbitration provision, the FAA "'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'" *Chiron*, 207 F.3d at 1130 (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)); *Rent-A-Center W., Inc. v. Jackson*, 130 S. Ct. 2772, 2777 (2010) (same); *Henry Schein, Inc. v. Archer and White Sales, Inc.*, ---U.S.---, 139 S.Ct. 524, 527-530 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract.  In those circumstances, a court possesses no power to decide the arbitrability issue.  That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless.").

Indeed, in *Coulter*, Judge Alejandro explained that "the Arbitration Provision's Delegation Clause provides that '[a]ll issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision' and grants the arbitrator 'exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement including, but not limited to any claim that all or any part of this arbitration provision or Agreement is void or voidable.'"  2021 WL 735726 at *4.  The court found that "[t]his provision constitutes a 'clear and unmistakable' delegation clause under *Henry Shein* and delegates the exclusive authority to resolve 'all issues' to the arbitrator, including the 'scope and enforceability' of the Arbitration Provision." *Id*.  In short, because the Terms of Use Agreement makes an unambiguous expression of intent to arbitrate arbitrability, any question over whether Plaintiffs' claims fall within the arbitration clause are for an arbitrator to decide. *Id*.; *Gillette v. First Premier Bank*, No. 3:13-CV-432-LAB-RBB, 2013 WL 3205827 at *2 (S.D. Cal. June 24, 2013) ("Given the parties' agreement to arbitrate gateway issues of arbitrability, there is actually very little here for the Court to decide.  There's simply no disputing that the credit card application Gillette filled out, as well as the subsequent credit card contract, contain an agreement to arbitrate. This being the case, the Court's work is more or less done.").

MOTION TO COMPEL ARBITRATION

But even if there had not been such delegation, where, as here, the parties have entered into a valid arbitration agreement, an "order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Tech.*, 475 U.S. at 650.  That is, "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Mitsubishi Motors*, 473 U.S. at 626.  Where an arbitration clause is broadly worded, there is a heightened presumption of arbitrability, such that "'[in] the absence of any express provision excluding a particular grievance from arbitration, ... only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.'" *AT&T Tech.*, 475 U.S. at 650 (quoting *United Steelworkers*, 363 U.S. at 582-83).

Here, at the outset, the Terms of Use Agreement admonishes:  "For the avoidance of doubt,  this Agreement expressly applies to . . . any and all transactions between you and ECS through the Websites, including for the provision of any Services or of any credit, personal, financial or other information delivered as part of or in conjunction with free Services or paid Services . . . ."  (Williams Decl., Ex. 6.)  The arbitration clause provides that "all disputes and claims between us arising out of this Agreement directly related to the Services or Websites to the maximum extent permitted by law" are "subject to arbitration."  (*Id.*)  It further provides that "[t]his agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us directly relating to the provision of any Service and/or your use of any Website subject to arbitration to the fullest extent permitted by law."  (*Id.*)  It then provides that "[t]he agreement to arbitrate includes, but is not limited to: claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website, whether based in contract, tort, statute[.]"  (*Id.*)

Like all other jurisdictions, the Ninth Circuit treats the phase "arising out of" and "relating to" in an arbitration clause as "broad and far reaching."  *Chiron*, 207 F.3d at 1131; *see also In re Remicade (Direct Purchaser) Antitrust Litigation*, 938 F.3d 515, 525 (3rd Cir. 2019) ("Courts have generally read the terms 'arising out of' or 'relating to' [in] a contract as indicative of an 'extremely

broad' agreement to arbitrate any dispute relating in any way to the contract.  [Citation]  Such broad clauses have been construed to require arbitration of any dispute between the contracting parties that is connected in any way with their contract." [Citation]); *see also Collins & Aikman Products Co. v. Building Systems, Inc.*, 58 F.3d 16, 20 (2nd Cir. 1995) ("'Any claim or controversy arising out of or relating to th[e] agreement' is the paradigm of a broad clause." (citing *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 251 (2d Cir. 1991).)  That being the case, if "the allegations underlying the claims 'touch matters' covered by the parties' ... agreement[], then those claims must be arbitrated[.]"  *Id.* (citations omitted).

Here, Plaintiffs' claims against Experian plainly "touch matters" covered by the arbitration clause.   Indeed, by virtue of their CreditWorks subscriptions, Plaintiffs saw how the loans at issue in this case were reporting on their Experian credit files.  Furthermore, claims under the FCRA are governed by a two-year statute of limitations, which is triggered on the date of discovery of an alleged violation.  *See* 15 U.S.C. § 1681p; *Willey v. J.P. Morgan Chase, N.A.*, No. 09 Civ. 1397(CM), 2009 WL 1938987, at *4 5 (S.D.N.Y. July 7, 2009).  The information Plaintiffs obtained through the their use of their CreditWorks service would place them on notice.  For all of these reasons, Plaintiffs' claims are subject to arbitration.

## II.     THE ACTION MUST BE STAYED PENDING ARBITRATION

Section 3 of the FAA expressly provides that where, as here, a valid arbitration agreement requires a dispute to be submitted to binding arbitration, the district court "shall . . . stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3.  Because Plaintiffs must be compelled to arbitrate their claims, the action should be stayed pending completion of arbitration.

///

///

///

///

MOTION TO COMPEL ARBITRATION

1

## <u>CONCLUSION</u>

2      For the foregoing reasons, Experian respectfully requests that the Court grant this

3   Motion, enter an order directing Plaintiffs to arbitrate their claims against EIS, and stay this

4   action pending the completion of arbitration.

5

6   Dated:  June 25, 2020                                JONES DAY

7
                                                         By:
8                                                            John A. Vogt

9                                                        Attorneys for Defendant
                                                         Experian Information Solutions, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO COMPEL ARBITRATION