Craig C. Marchiando, Esq. (SBN 283829)
Leonard A. Bennett, Esq. (*pro hac vice*)
**CONSUMER LITIGATION ASSOCIATES, P.C.**
Four Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: craig@clalegal.com

*Attorneys for Plaintiffs and the Class*
[*Additional Counsel on Signature Page*]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| ELETTRA MEEKS, JOSEPH DELACRUZ, STEPHANIE LAGUNA, AMBER LEONARD, and BECKY WITT, *on behalf of themselves and others similarly situated*, | Case No.: 3:21-cv-03266-VC |
| Plaintiffs, | |
| v. | **PLAINTIFFS' OPPOSITION TO EXPERIAN INFORMATION SOLUTIONS, INC.'S MOTION TO COMPEL ARBITRATION** |
| EXPERIAN INFORMATION SOLUTIONS, INC.; MIDWEST RECOVERY SYSTEMS, LLC; and CONSUMER ADJUSTMENT COMPANY, INC., | |
| Defendants. | |

# <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ...........................................................................................................1

**BACKGROUND** ............................................................................................................1

I.      Experian relies on Plaintiffs' contracts with a different company,
        ConsumerInfo.com. ...........................................................................................1

II.     ConsumerInfo.com and each Plaintiff agreed to arbitrate disputes between
        them and "directly related" to ConsumerInfo.com Inc.'s services and websites. ...................2

**ARGUMENT** ................................................................................................................3

I.      Plaintiffs did not enter into any agreement with Experian. ........................................3

II.     The motion should be denied because Experian has not attempted to,
        and cannot, satisfy its burden of proof that an exception applies. ............................5

        A.      Mandatory arbitration of consumers' FCRA claims against Experian
                was not a "motivating purpose of the contracting parties." ...........................6

                1.      The plain language of the arbitration contract only covers
                        claims "directly related" to ConsumerInfo.com's services
                        or websites. ...................................................................6

                2.      The contract's clarifying provision unambiguously establishes
                        that the parties did not intend to arbitrate FCRA claims. ...............8

                3.      Experian's interpretation of the contract would lead to absurd
                        results that would be inconsistent with the intent of the Parties......9

                4.      The Court should interpret the contract as a whole and any
                        ambiguities should be interpreted in favor of Plaintiffs. ..............10

        B.      Requiring arbitration here is not consistent with the objectives of the
                contract and the reasonable expectations of the contracting parties..........12

III.    This Court should decide the third-party beneficiary question. ...............................14

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page**

***Federal***

*Barbosa v. Midland Credit Mgmt., Inc.,*
   981 F.3d 82 (1st Cir. 2020)............................................................................... 15

*Calderon v. Sixt Rent a Car, LLC,*
   No. 20-10989, 2021 WL 2946428 (11th Cir. 2021)......................................... 10–12

*Comer v. Micor, Inc.,*
   436 F.3d 1098 (9th Cir. 2006) ..............................................................................5

*Corcoran v. CVS Health Corp.,*
   779 F. App'x 431 (9th Cir. 2019) ..........................................................................9

*Coulter v. Experian Info. Sols., Inc.,*
   2021 WL 735726 (E.D. Pa. Feb. 25, 2021) ......................................................... 15

*Cummings v. Cenergy Int'l Services, LLC,*
   271 F. Supp. 3d 1182 (E.D. Cal. 2017) ..................................................................8

*Dreher v. Experian Info. Solutions, Inc.,*
   No. 3:11-cv-624-JAG (E.D. Va.) ............................................................................2

*Gerszberg v. Li & Fung (Trading) Ltd.,*
   215 F. Supp. 3d 282 (S.D.N.Y. 2016) .................................................................. 15

*Gingras v. Think Fin., Inc.,*
   922 F.3d 112 (2d Cir. 2019) ................................................................................ 14

*Henry Schein Inc. v. Archer & White Sales, Inc.,*
   139 S. Ct. 524 (2019)........................................................................................... 15

*Int'l Bhd. of Teamsters v. NASA Servs., Inc.,*
   957 F.3d 1038 (9th Cir. 2020) ............................................................................. 12

*Kramer v. Toyota Motor Corp.,*
   705 F.3d 1122 (9th Cir. 2013) ..........................................................................4, 14

*Lomeli v. Midland Funding, LLC,*
   No. 19-CV-01141-LHK, 2019 WL 4695279 (N.D. Cal. Sept. 26, 2019) ............. 15

*Maples v. SolarWinds, Inc.,*
   50 F. Supp. 3d 1221 (N.D. Cal. 2014) ................................................................. 12

*MacDonald v. CashCall, Inc.,*
   883 F.3d 220 (3d. Cir. 2018) ............................................................................... 14

*Murphy v. DirecTV, Inc.,*
   724 F.3d 1218 (9th Cir. 2013) ...........................................................................1, 5

*New Prime Inc. v. Oliveira,*
   139 S. Ct. 532 (2019) ........................................................................................ 15

*Norcia v. Samsung Telecomms. Am., LLC,*
   845 F.3d 1279 (9th Cir. 2017) ..................................................................... 5–6, 12

*Power Integrations, Inc. v. ON Semiconductor Corp.,*
   396 F. Supp. 3d 851 (N.D. Cal. 2019) .................................................................. 5

*Reading Health Sys. v. Bear Stearns & Co.,*
   900 F.3d 87 (3d Cir. 2018) ................................................................................... 7

*Revitch v. DIRECTV, LLC,*
   977 F.3d 713 (9th Cir. 2020) .......................................................................*passim*

*SCC Alameda Point LLC v. City of Alameda,*
   897 F. Supp. 2d 886 (N.D. Cal. 2012) ................................................................ 10

*Soto v. Am. Honda Motor Co.,*
   946 F. Supp. 2d 949 (N.D. Cal. 2012) ................................................................ 15

***State***

*Fuentes v. TMCSF, Inc.,*
   237 Cal. Rptr. 3d 256 (Cal. Ct. App. 2018) ......................................................... 7

*Goonewardene v. ADP, LLC,*
   434 P.3d 124 (Cal. Ct. App. 2019) .................................................................. 5–6

*Pillar Project AG v. Payward Ventures, Inc.,*
   279 Cal. Rptr. 3d 117 (2021) ............................................................................. 11

**<u>Statutes</u>**

***Federal***

15 U.S.C. § 1681j ....................................................................................................... 2

***State***

Cal. Civ. Code § 1559 ................................................................................................. 5

**INTRODUCTION**

To avoid class liability for its widespread violations of the Fair Credit Reporting Act, Experian attempts to force Plaintiffs into individual arbitration. But Experian's problem is that Plaintiffs never signed a contract with Experian. So Experian plucked a contract from an entirely different company, ConsumerInfo.com, in an attempt to piggyback on its arbitration agreement with Plaintiffs. That cynical effort should be rejected. Fundamentally, arbitration is a matter of contract—a matter of consent, not coercion. Experian cannot enforce a contract to which it is not a party and with which it has nothing to do.

Experian has waived the only even arguable theory—that it is a third-party beneficiary of the contract—that could support its Motion here. That theory would have required Experian to "bear[] the burden of proving that it is a third-party beneficiary" because a non-signatory may only enforce a contract if there is clear evidence that the parties "intended the contract to benefit the third party." *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1234 (9th Cir. 2013). But Experian *never* asserts or suggests, let alone proves, that it is a third-party beneficiary. Experian's Motion should also be denied for another reason. It filed a brief that exceeds the 15-page limitation of the Court's standing order.

Nor could Experian satisfy its burden here even if it tried. The text of the contract permits arbitration of only those disputes that both arise out of the ConsumerInfo.com's contract and that are "directly related to the Services or Websites" it provided. (ECF 20-2 at 53[1].) The present dispute is not even tangentially related, let alone directly related, to the "Services" or "Websites" provided by ConsumerInfo.com—a non-FCRA governed company primarily offering credit monitoring services in exchange for a fee. Instead, the claim here arises from Experian's FCRA violations for reporting information related to illegal debts to Plaintiffs' potential creditors.

**BACKGROUND**

**I.      Experian relies on Plaintiffs' contracts with a different company, ConsumerInfo.com.**

Experian is a credit reporting agency. These agencies collect information about consumers and sell consumer reports to creditors and employers. Thus, Experian's customers are not everyday

---

[1] Using the page numbers of the header attached by the Clerk upon filing.

PLAINTIFFS' OPPOSITION TO EXPERIAN'S MOTION TO COMPEL ARBITRATION
(Civil Action No. 3:21-cv-03266-VC)

consumers but, instead, other companies. As a result, consumers do not typically enter into commercial transactions with credit reporting agencies like Experian, and they are not subject to any contractual relationship with these companies when it comes to the collection or sale of their credit information. Given this, Congress enacted the FCRA to protect consumers whose information is collected and sold by agencies like Experian. One of the FCRA's protections is that consumers are entitled to access free credit reports annually from the major three credit bureaus: Experian, Equifax, and TransUnion. *See* 15 U.S.C. § 1681j. Although these credit reports are available from a centralized source, www.AnnualCreditReport.com, it remains difficult for consumers to access because several companies heavily market their own "free" credit reports that are bundled with other commercial products and services, like credit monitoring services that charge consumers a fee to monitor their credit reports and alert them to any changes.

ConsumerInfo.com is one of these companies. It provides independent credit monitoring services to consumers. As Experian has explained, it and ConsumerInfo.com have "the same ultimate corporate parent—Experian plc" but are "separate legal entities." *Dreher v. Experian Info. Solutions, Inc.*, No. 3:11-cv-624 (E.D. Va.), ECF 380 at 2. And unlike Experian, ConsumerInfo.com is not subject to the FCRA because it does "not maintain [its] own database(s) of information and do[es] not sell consumer credit information to third parties (other than the consumers who are the subjects of [its] reports(s))." *Id*. Instead, businesses like ConsumerInfo.com purchase copies of consumer's report from one or more of the national credit bureaus before providing them to consumers. *Id*. ConsumerInfo.com provides its services through various different websites, such as FreeCreditReport.com. (ECF 20-2 at 47 (listing websites).)

**II.     ConsumerInfo.com and each Plaintiff agreed to arbitrate disputes between them and "directly related" to ConsumerInfo.com Inc.'s services and websites.**

ConsumerInfo.com's contract includes a provision providing for binding arbitration between ConsumerInfo.com and the consumer for claims "directly related to the Services or Websites." For example, the first subsection of the arbitration provision states:

> <u>**ECS and you**</u> agree to arbitrate all disputes and claims between us arising out of this Agreement **<u>directly related to the Services or Websites</u>** to the maximum extent

permitted by law . . . . This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us **directly relating to the provision of any Service and/or your use of any Website** subject to arbitration to the fullest extent permitted by law. The agreement to arbitrate includes, but is not limited to: claims arising out of or relating to **any aspect of the relationship between us arising out of any Service or Website** . . . .

(ECF 20-2 at 54 (emphasis added).) The term "Service" is defined to include "the credit report(s), credit risk score(s), credit monitoring, credit score monitoring and credit score tracking (including all the data and information contained therein), the receipt of any alerts notifying you of changes" to information contained in the reports. (*Id.* at 51.)

As a non-FCRA governed business, ConsumerInfo.com's contract also goes out of its way to distinguish its credit monitoring services from what a credit reporting agency does, including Experian. For example, it includes an "FCRA disclosures" section that specifies that its services in no way relate to Experian's FCRA obligations. (*Id.* at 56.) It further explains that the "credit report you are requesting" from ConsumerInfo.com "is not intended to constitute the disclosure of Experian Credit Bureau information required by the FCRA or similar state laws." *Id.*[2] The contract also clarifies that the right to "dispute inaccurate or incomplete information in your Experian Credit Bureau or to receive a copy of your Experian Credit Bureau consumer disclosure" is not based on purchasing a credit report or other information from ConsumerInfo.com. *Id.*

## ARGUMENT

### I.   Plaintiffs did not enter into any agreement with Experian.

Experian's motion to compel arbitration glosses over a critical point: it never entered into an arbitration contract with Plaintiffs. Instead, it produced a contract between Plaintiffs and ConsumerInfo.com—an entirely separate entity. It describes in detail the language of ConsumerInfo.com's contract and then asserts—in entirely conclusory fashion—that "a valid agreement to arbitrate exists between" Plaintiffs and Experian. (ECF 20 at 16.) That is wrong. Experian and ConsumerInfo.com are not the same entities and only one of them—ConsumerInfo.com—is a named party and signatory to the arbitration contract with Plaintiffs.

---

[2] "Experian Credit Bureau" is another name for the Experian Defendant in this case.

Experian does not dispute this basic point. It argues instead (at 16) that, because it is an "affiliate" of ConsumerInfo.com, and because the contract purports, at one point, to include "affiliates," it can "invoke the agreement's arbitration clause" no differently than ConsumerInfo.com. That is not enough to establish that a valid contract exists between a consumer and the party seeking to enforce it. Under California law, "the contractual right to compel arbitration 'may not be invoked by one who is not *a party to the agreement* and does not otherwise possess the right to compel arbitration.'" *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013) (emphasis added).

The Ninth Circuit's recent decision in *Revitch v. DIRECTV, LLC*, 977 F.3d 713 (9th Cir. 2020), illustrates the point. There, as here, an arbitration clause in a contract entered into between a consumer and one corporate entity (AT&T Mobility) for a specific transaction (wireless cell service) "purport[ed] to include all affiliates" of the company. *Id.* at 714. After a separate entity (DIRECTV) was sued for entirely different conduct unrelated to the underlying contract and transaction, it latched onto this affiliate language in an attempt to "piggyback onto the arbitration clause." *Id.* The Ninth Circuit held that no "valid agreement exist[ed]" between the affiliate company and the consumer. *Id.*

In reaching this conclusion, the court accepted DIRECTV's argument that it qualified as an affiliate. But it nonetheless held that "a valid agreement to arbitrate between Revitch and DIRECTV does not exist" because, looking to the "reasonable expectation[s] of the parties at the time of contract," it recognized that "the *mutual* intent of the *parties*"—that is, the consumer and the signatory company—could not have been "to form an agreement to arbitrate any and all disputes that might ever arise" between the consumer and some infinite category of affiliates "no matter how unrelated" to the underlying transaction or service. *Id.* at 720. To the contrary, "no reasonable person would think that checking a box accepting the 'terms and conditions' necessary to obtain cell phone service would obligate them [sic] to arbitrate literally every possible dispute he or she might have with the service provider, let alone all of the affiliates under AT&T Inc.'s corporate umbrella—including those who provide services unrelated to cell phone coverage." *Id.* (internal quotations omitted).[3]

---

[3] The fact that, in *Revitch*, DIRECTV did not become an affiliate until after the parties entered into the contract does not alter the basic point—that, because arbitration is a matter of consent, what matters for purposes of determining whether a valid arbitration contract exists is whether the parties

The same is true here. The claims in this case—which involve alleged violations of the FCRA arising from inaccurate information provided to third parties by Experian—have "nothing to do with" the CustomerInfo.com contract or transaction—which involved an entirely separate credit monitoring program. *Id.* And Experian likewise does not have "anything to do with providing" the services promised in the CustomerInfo.com—it is a stranger to that commercial relationship and transaction. *Id.* When Plaintiffs agreed to their contract with CustomerInfo.com for the promised credit monitoring services, therefore, they "could not reasonably have expected that [they] would be forced to arbitrate an unrelated dispute" with an entirely distinct entity based on entirely unrelated conduct. *Id.* at 718. As a result, no valid contract exists between Plaintiffs and Experian.

## II.  The motion should be denied because Experian has not attempted to, and cannot, satisfy its burden of proof that an exception applies.

The only way that Experian can successfully compel arbitration here is if it can establish a right to enforce the contract based on an exception to the basic rule that "only signatories to an arbitration agreement are obligated to submit to binding arbitration." *Murphy*, 724 F.3d at 1229. And the only arguable exception here is the right, in certain limited circumstances, of nonsignatories to "enforce arbitration agreements as third party beneficiaries." *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006). But Experian failed to explain how it falls within this, or any other, exception.[4]

Under California law, a nonsignatory to a contract may enforce that contract as a third-party beneficiary only if it was "made expressly for [the nonsignatory's] benefit." CAL. CIV. CODE § 1559. This is a high bar. It is not enough that a contract benefits a third party or even that the contracting parties know their agreement will benefit a third party. *Goonewardene v. ADP, LLC*, 434 P.3d 124, 133 (Cal. Ct. App. 2019). The "parties to the contract must have intended the third party to benefit." *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1290–91 (9th Cir. 2017).

---

intended—based on their reasonable expectations at the time of the contract—to form an arbitration contract with the specific affiliate that now seeks to enforce it.

[4] In its motion, Experian does not even claim that one of the non-signatory exceptions applies in this case. This failure is fatal to this Motion. *Power Integrations, Inc. v. ON Semiconductor Corp.*, 396 F. Supp. 3d 851, 861 (N.D. Cal. 2019) (holding that a party that "did not raise" an "argument in its opening brief" "waived the argument"). Out of caution, Plaintiffs explain why this theory fails.

And the third party bears the burden of demonstrating that it is an intended beneficiary of the agreement. To enforce a contract as a third-party beneficiary, a nonsignatory must demonstrate that "the express provisions of the contract," considered in light of the "relevant circumstances," show: "not only" that (1) "the third party would in fact benefit from the contract"; "but also" that (2) "a motivating purpose of the contracting parties was to provide a benefit to the third party"; and (3) permitting the third party to enforce the contract "is consistent with the objectives of the contract and the reasonable expectations of the contracting parties." *Goonewardene*, 434 P.3d at 132–33. "All three elements must be satisfied." *Id*. Experian does not even try to satisfy these requirements—which, on its own, is enough to deny the motion. *Norcia*, 845 at 1291 (denying motion to compel because movant failed "to bear its burden of establishing it was a third party beneficiary"). But, as explained below, even if Experian were to try to meet these requirements, it would fail.

### C.   Mandatory arbitration of consumers' FCRA claims against Experian was not a "motivating purpose of the contracting parties."

To invoke the arbitration provision as a third-party beneficiary, Experian must demonstrate that a motivating purpose of both Plaintiffs and ConsumerInfo.com was to allow Experian to invoke arbitration against Plaintiffs for their FCRA claims. The evidence in this case establishes the opposite.

#### 1.   The plain language of the arbitration contract only covers claims "directly related" to ConsumerInfo.com's services or websites.

The motivating purpose of the contract was to create the consumer's account with ConsumerInfo.com so that the consumer could use ConsumerInfo.com's websites and/or obtain copies of their credit reports. (ECF 20-2 at 47.) And the motivating purpose of the arbitration provision, in turn, was to enable the consumer and ConsumerInfo.com to arbitrate only those disputes directly related to the contract, ConsumerInfo.com's services, and the consumer's use of ConsumerInfo.com's websites. This is clear from the express language of the contract. It restricts use of the arbitration to only those claims directly related to ConsumerInfo, Inc.'s services and websites:

> ECS and you agree to arbitrate all disputes and claims between us arising out of this Agreement directly related to the Services or Websites to the maximum extent permitted by law . . . . This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us directly relating to the provision of any Service and/or your use of any Website subject to arbitration to the fullest extent permitted by law. The agreement to arbitrate includes, but is not limited to:

claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website . . . .

(ECF 20-2 at 53.)

Experian's conduct—the furnishing of inaccurate credit reports containing bogus debts to third parties—is not covered by this provision, either explicitly or impliedly. And where the language of the relevant arbitration provision explicitly restricts the type of claims that may be arbitrated, the provision "affirmatively disproves any intent" to benefit a third party seeking to enforce other claims not explicitly authorized. *Fuentes v. TMCSF, Inc.*, 237 Cal. Rptr. 3d 256, 265 (Cal. Ct. App. 2018).

Experian does not argue that the claims here—that Experian furnished inaccurate credit information to potential creditors in violation of the FCRA—"directly relate to" the services or website that are the subject of the contract. Instead, it insists (at 19) that it is entitled to enforce this arbitration contract because "Plaintiffs saw how the loans at issue in this case were reporting on their Experian credit files" through ConsumerInfo.com and that, so long as allegations in the complaint "touch matters" covered by the contract, the claims can be arbitrated. Putting aside the complete lack of evidence supporting this assertion, this argument fails for a more fundamental reason: it contradicts the plain language of the arbitration contract. By its terms, the contract permits arbitration of only those disputes and claims "directly related to the Services or Websites." (ECF 20-2 at 9.) It does not permit arbitration of any claims, as Experian would have it, that "touch matters covered by the arbitration clause."

Experian's own defense of its a textual interpretation reinforces the point. It justifies its "touch matters" interpretation by arguing (at 19) that, because the contract at one point employs the phrase "arising out of or relating to," it must be construed to "require arbitration of any dispute between the contracting parties that is connected in any way with their contract." This argument is self-defeating because Experian is not one of "the contracting parties," but beyond that, it ignores the explicit limitation that immediately follows this language—that the only claims that may be arbitrated are those "arising out of or relating to any aspect of the relationship between us *arising out of any Service or Website*." This phrase specifically cabins the type of claims that may be arbitrated under the contract to only those "arising out of" ConsumerInfo.com's "Service or Website." *See Reading Health Sys. v.*

*Bear Stearns & Co.*, 900 F.3d 87, 99 (3d Cir. 2018) ("'[A]rising out of' . . . should be interpreted in accordance with the ordinary meaning of that phrase—i.e., to originate from a specified source").

2.    **The contract's clarifying provision unambiguously establishes that the parties did not intend to arbitrate FCRA claims.**

Experian's interpretive theory fails for another reason: It cannot be squared with a specific clarifying provision that ConsumerInfo.com included in its contract to make clear that it did not cover any claims under the FCRA. As discussed above, the plain language of the arbitration contract demonstrates that the parties did not intend it to cover any claims not "directly related to" ConsumerInfo.com's "Services or Websites." (ECF 20-2 at 55.) But ConsumerInfo.com's contract went further. To avoid even the possibility of any ambiguity, in 2018 it included the following clarifying provision immediately after describing the claims which were subject to arbitration: "***for the avoidance of doubt***, any dispute you may have with us arising out of or relating to the Fair Credit Reporting Act (FCRA) . . . including but not limited to claims for alleged inaccuracies in your credit file, shall not be governed by this agreement to arbitrate." (*Id*. at 9 (emphasis added).) This language is fatal for Experian—it proves that the contract cannot, in any way, be read to either permit arbitration of the very claims at issue here or permit an inference that the contract was made with the intent or expectation that Experian could, as a third-party, enforce it to send FCRA claims into arbitration.

Experian, no doubt, will be quick to point out that this clarifying provision was removed from the contract in 2021. But "[i]n determining the meaning of a written contract allegedly made, in part, for the benefit of a third party, evidence of the circumstances and negotiations of the parties in making the contract is both relevant and admissible." *Cummings v. Cenergy Int'l Services, LLC*, 271 F. Supp. 3d 1182, 1189 (E.D. Cal. 2017). And the fact that ConsumerInfo.com took this language out later does not help its cause—the 2021 Contract and 2018 Contract are identical in *all* material respects except for the clarifying provision. ECF 20-2 at 53; *with* ECF 20-2 at 9. So deletion of that sentence cannot alter the *meaning* of the previous ones because it did not purport to do that in the first place. Whatever the arbitration contract meant in 2018 must, in short, remain the same in 2021.

Bottom line: Adopting Experian's interpretation of the arbitration contract would disregard both the plain meaning of the phrase "directly related to Services or Websites," as well as the clarifying provision confirming that this contract was not intended to cover FCRA claims or authorize a third party like Experian to force FCRA claims into arbitration.

### 3. Experian's interpretation of the contract would lead to absurd results that would be inconsistent with the intent of the Parties.

Experian suggests that the contract's single reference to affiliates hands it the right to invoke the arbitration contract for unrelated claims. That cannot be true. Under Experian's interpretation, "it would necessarily mean that the parties intended to arbitrate" even "tort claims," such as if Plaintiffs' "were hit by [an Experian] delivery van," or if they "tripped over a dangerous condition in" at Experian's headquarters, or if they "bought shares of stock in" Experian. *Revitch*, 977 F.3d at 720–21. The Ninth Circuit has squarely rejected analogous efforts where neither the entity nor the dispute bore any material relation to the services. *Id*.

And, under Experian's reading, this contract would also give consumers the right to enforce the arbitration provision against other "users" of ConsumerInfo.com's websites for unrelated claims.[5] In other words, the Plaintiffs in this action would be able to invoke the arbitration provision against another Plaintiff for any unrelated claims, or even against any person who had "simply browse[d] or access[ed]" one of ConsumerInfo.com's websites. Such an absurd result was obviously not intended by Plaintiffs and ConsumerInfo.com when they agreed to arbitrate "all disputes and claims between us arising out of this Agreement directly related to the Services or Websites." *Cf. Revitch*, 977 F.3d at 717 (rejecting the movant's interpretation because it would lead to "absurd results"). Indeed, such an overly expansive and absurd reading of this contract explains why non-signatories are held to a rigorous standard when attempting to enforce contracts to which they are not a party. Experian's request to compel arbitration of unrelated claims that the contract expressly disclaimed requires it to

---

[5] It defines references to "ECS" in the arbitration provision to include "authorized or unauthorized users or beneficiaries of Services and/or Websites or information under this or prior Agreements between us relating to Services and/or Websites." (ECF 20-2 at 54).

9

propose an interpretation that would inevitably lead to absurd results and that runs directly contrary to the actual language employed by the parties in the contract.

      **4.**     **The Court should interpret the contract as a whole and any ambiguities should be interpreted in favor of Plaintiffs.**

      Finally, even if Experian's interpretation of the contract could be considered plausible, it is not anywhere close to the most persuasive. Reading this contract in its entirety, it is clear that the arbitration provision was intended to permit arbitration only between the individual consumer signing the contract and ConsumerInfo.com. *See, e.g.*, *SCC Alameda Point LLC v. City of Alameda*, 897 F. Supp. 2d 886, 895 (N.D. Cal. 2012) ("In general, when interpreting contracts, the agreement must be 'read as a whole in a manner which reconciles apparent repugnancies and, to the extent possible, gives some meaning to each clause.'"). Consider, first, how it employs references to the relevant parties throughout the contract. It repeatedly, and specifically, refers just to a consumer ("you") and ConsumerInfo.com ("ECS" or "us") as the two parties entering into the contract.[6] It also advises a consumer—at the very beginning of the arbitration provision and in all caps—that "MOST CUSTOMER CONCERNS CAN BE RESOLVED . . . BY CALLING ECS'S CUSTOMER CARE DEPARTMENT" and assures the consumer that it would be "unlikely" that ECS's customer care department would be "unable to resolve a complaint you may have regarding a service or website to your satisfaction." (ECF 20-2 at 53.) Accepting Experian's interpretation of this contract would mean that customers bringing lawsuits against third-parties for misconduct wholly unrelated to CustomerInfo.com would be encouraged to route their litigation through ECS's customer care department, even though CustomerInfo.com has no discernible interest in this litigation. *See Calderon v. Sixt Rent a Car, LLC*, No. 20-10989, 2021 WL 2946428, at *3 (11th Cir. 2021) (rejecting just such an interpretation and asking what one company's dispute resolution program would do "to contemplate a claim about another company's [claims]").

---

[6] ECF No. 20-2 at 53 ("ECS and you agree to arbitrate all disputes and claims between us arising out of his Agreement directly related to the Services or Websites . . . ."); *id.* ("This agreement to arbitrate is intended to be broadly interpreted and to make all disputes between us directly relating to the provision of any Service and/or our use of any Website subject to arbitration. . . .").

Common sense reinforces this understanding. Experian's interpretation would mean that a staggering range of lawsuits that do not concern ConsumerInfo.com would be subject to its mandatory arbitration rules. On Experian's reading, every customer who signed this contract would have agreed to arbitrate every dispute it ever had with a nearly limitless set of entities even if the customer had only visited CustomerInfo.com's site once. (*See* ECF 20-2 at 47 (binding anyone who "simply browse[s] or acces[es] a Website").) And regardless of whether Experian insists that this would be true—"likely because it seems too bizarre"—it "would be the unavoidable consequence" of Experian's "boundless" interpretation of the contract. *Calderon*, 2021 WL 2946428 at *3.

And even on its own terms, Experian's only basis for claiming that the contract authorizes it to invoke the arbitration agreement—a single inclusion of "affiliates" in one definitional section—is contradicted by another definitional section earlier in the contract. (*Compare* ECF 20-2 at 47 ("For purposes of this Agreement, the terms 'we,' 'us' or 'ECS' refer to ConsumerInfo.com, Inc., an Experian company (also known as Experian Consumer Services), and referred to as 'Experian' on the Websites, its predecessors in interest, successors and assigns, and any of its third party service providers (including, without limitation, cloud service providers) who ECS uses in connection with the provision of the Services to you."); *with id.* at 54 ("For purposes of this arbitration provision, references to 'ECS,' 'you,' and 'us' shall include our respective parent entities, subsidiaries, affiliates (including, without limitation, our service provider, CSID), agents, employees, predecessors in interest, successors and assigns, websites of the foregoing, as well as all authorized or unauthorized users or beneficiaries of Services and/or Websites or information under this or prior Agreements between us relating to Services and/or Websites.").)

That ambiguity should be interpreted in favor of the consumer. Because the question here is one of formation—did the parties either form a valid contract or may one of them nonetheless obtain the benefit of it—the "strong public policy in favor of arbitration" is inapplicable as an interpretive tool capable of resolving any ambiguities. *Pillar Project AG v. Payward Ventures, Inc.*, 279 Cal. Rptr. 3d 117, 126 (2021) (explaining that this policy "does not extend to those who are not parties to an arbitration agreement"); *see also Norcia*, 845 F.3d at 1291 (pro-arbitration canons do not apply "when

the question is 'whether a particular party is bound by the arbitration agreement"). Instead, the normal rules of contract interpretation apply, including that a "[contract] provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable," *Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1044 (9th Cir. 2020), and that, when ambiguities "cannot be dispelled by application of the other rules of contract interpretation, they are resolved against the drafter." *Maples v. SolarWinds, Inc*., 50 F. Supp. 3d 1221, 1228 (N.D. Cal. 2014).

And those standard contract rules are all the more relevant where, as here, the FAA does not apply at all because Plaintiffs' FCRA claims against Experian do not "arise out" of their contract with CustomerInfo.com. That is because section 2 makes clear that the FAA applies only to controversies "arising out" of the contract containing the arbitration agreement that a party is trying to enforce. *See Calderon*, 2021 WL 2946428, at *6. So, "[b]y negative implication, the FAA does not require the enforcement of an arbitration clause to settle a controversy that does not arise out of the contract or transaction." *Revitch*, 977 F.3d at 721 (O'Scannlain, J., concurring).

This is such a case: The "controversy" here—Experian's FCRA violations—does not in any way "arise out" of Plaintiffs' contracts with CustomerInfo.com—the only contract that contains an arbitration provision. The FAA, therefore, simply does not apply. As the Eleventh Circuit recently held, Section 2's language requires that the controversy be "an immediate, foreseeable result of the performance" of the contract containing the arbitration provision. *Calderon*, 2021 WL 2946428, at *6. For the FAA to apply, then, the controversy must—at the very least—have some "relationship" or "connection" to that contract. *See Revitch*, 977 F.3d at 722 (O'Scannlain, J., concurring). Here, there is plainly no such relationship between Plaintiffs' FCRA claims against Experian and their contract with CustomerInfo.com.

### D.  Requiring arbitration here is not consistent with the objectives of the contract and the reasonable expectations of the contracting parties.

To invoke the arbitration provision as a third-party beneficiary, Experian must also demonstrate that its interpretation of the contract is consistent with the objectives of the contract and the reasonable expectations of the contracting parties. As discussed above, the contract facilitates a consumer's access to ConsumerInfo.com's services and websites. Additionally, the objective of the

arbitration provision is, consistent with the purpose of the contract as a whole, limited to requiring the arbitration of claims "directly related" to ConsumerInfo.com's services and websites. (ECF 20-2 at 53–54.) Experian's bid to invoke the arbitration contract is wholly inconsistent with these objectives.

Nor has Experian shown that it was within the reasonable expectations of each Plaintiff in signing a contract with ConsumerInfo.com that they were agreeing to arbitrate claims with Experian for its conduct as a credit bureau. Instead, the evidence shows only that Plaintiffs were interested in the services provided by ConsumerInfo.com, including accessing "credit report(s), credit risk score(s), credit monitoring, credit score monitoring and credit score tracking. . . ." (ECF 20-2 at 47 (describing the term "Service"); *see also id*. at 51 (providing a "general description" of the services as a "means to review" your personal finance and credit information).) Thus, ConsumerInfo.com's services related to credit monitoring, which is a separate and distinct function from furnishing an actual credit report to a consumer's potential creditor or employer.

The distinction between ConsumerInfo.com's credit monitoring service and Experian's role as a credit reporting agency is highlighted throughout the contract. For example, the contract makes clear that a consumer's credit file is maintained by Experian as a credit bureau, that ConsumerInfo.com has permission to access the consumer's credit reports and scores, and that ConsumerInfo.com has permission to share information with Experian on behalf of the consumer. (ECF 20-2 at 49–50.) ConsumerInfo.com explains that "[t]here are three different major credit reporting agencies— Experian Credit Bureau, TransUnion® and Equifax®—that maintain a record of your history known as your credit report." (*Id*. at 64.) ConsumerInfo.com is not a credit reporting agency but instead just accesses and shares information with these three major credit reporting companies. (*Id*. at 49–50.) Thus, when a consumer signs up for paid credit monitoring, ConsumerInfo.com "cannot guarantee that [he or she] will be successfully enrolled in monitoring with Experian Credit Bureau, Equifax, or TransUnion." *Id*. at 66.

Finally, the FCRA disclosures in ConsumerInfo.com's contract also demonstrate that the services it offers has nothing to do with Experian's duties to maintain accurate information in a consumer's credit file. (*See id*. at 56 (explaining consumers do not need to purchase anything from

ConsumerInfo.com "to dispute inaccurate or incomplete information in your Experian Credit Bureau file or to receive a copy" of their disclosure from Experian); *id*. (stating that the credit report provided by ConsumerInfo.com is not the same as the disclosure required by Experian under the FCRA); *id*. at 57 (stating that a credit report obtained from ConsumerInfo.com may not have the same information as one obtained by Experian, Trans Union, or Equifax)). As a result, when consumers signed up for services from ConsumerInfo.com, it could not have been within their reasonable expectations that they would be forced to arbitrate unrelated FCRA claims against Experian.

### III.    This Court should decide the third-party beneficiary question.

Shifting gears, Experian argues that this Court "possesses no power" to do anything in response to its Motion other than to compel arbitration because of the existence of a delegation clause in ConsumerInfo.com's contract. (*See* ECF 20 at 16–17 (quoting *Henry Schein Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524, 527–30 (2019)).) But that is wrong for the same reason that Experian cannot enforce the broader arbitration contract here—it is not a signatory to the delegation clause either. *See, e.g.*, *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 538 (2019) ("A delegation clause is merely a specialized type of arbitration agreement, and the [FAA] 'operates on this additional arbitration agreement just as it does on any other.'"); *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) (invalidating delegation clause on the same basis as the entire arbitration contract); *MacDonald v. CashCall, Inc.*, 883 F.3d 220 226–27 (3d. Cir. 2018) (same). Experian may only enforce the delegation contract if it can satisfy the strict requirements for establishing itself as a third-party beneficiary of the delegation contract. And because it has failed entirely to do that, its attempt to enforce the separate delegation clause likewise fails.

This conclusion flows from the basic requirements that must be met before a court will send any questions to arbitration. It is well settled that "whether parties have agreed to 'submi[t] a particular dispute to arbitration' is typically an 'issue for judicial determination." *Kramer*, 705 F.3d at 1127. A determination of the arbitrability of claims is for the court to decide unless there is "clear and unmistakable evidence" that *the parties* agreed to arbitrate arbitrability. *Id*. Here again, Experian glosses over the actual issue before this court, which is "whether a court or an arbitrator must decide

whether a non-signatory *actually* is, as it claims to be, a third-party beneficiary entitled to enforce such an agreement." *Gerszberg v. Li & Fung (Trading) Ltd.*, 215 F. Supp. 3d 282, 288 (S.D.N.Y. 2016). When a party is a non-signatory, "the issue is not one of agreement *scope*, but one of agreement *formation*." *Revitch*, 977 F.3d at 720. So, as this Court explained: "the threshold issue of whether the delegation clause is even applicable to a certain party must be decided by the Court." *Soto v. Am. Honda Motor Co.*, 946 F. Supp. 2d 949, 954 (N.D. Cal. 2012).[7]

Experian attempts to skip this first step of determining the parties who are bound to the delegation clause. Instead, it wrongly contends (at 16–17) that this Court "possesses no power" because of the mere existence of a delegation clause. But the Court "must first decide which parties are bound by [the] delegation clause, before the arbitrator can decide the interpretation and scope of the arbitration clause." *Soto*, 946 F. Supp. 2d at 954; *see also Henry Schein Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) ("To be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists.").

So too here. Experian cannot invoke the delegation provision until it proves that a valid agreement exists between Plaintiffs and Experian. To do so, Experian must prove that it actually is a third-party beneficiary of the arbitration agreement and its related delegation provision. Were it otherwise, just about every person or business in the United States could be forced into arbitration because they signed a contract with some unrelated business that contained a broad delegation provision. Because Experian has failed to claim—let alone prove—that it was a third-party beneficiary of ConsumerInfo.com's contract (delegation included), the motion should be denied.[8]

---

[7] *See also Lomeli v. Midland Funding, LLC*, 2019 WL 4695279, at *8 (N.D. Cal. Sept. 26, 2019) (quoting *Soto*); *Barbosa v. Midland Credit Mgmt., Inc.*, 981 F.3d 82, 93 n.13 (1st Cir. 2020) (noting that even though the arbitration clause said "claims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved exclusively and finally by binding arbitration," this was not "clear and unmistakable evidence that the parties intended an arbitrator to determine whether the [non-signatory] parties attempting to enforce the arbitration provision had the requisite authority to do so").

[8] As Experian notes, in *Coulter v. Experian Info. Sols., Inc.*, 2021 WL 735726, at *1 (E.D. Pa. Feb. 25, 2021), a district judge in Pennsylvania granted Experian's motion to compel arbitration of FCRA claims under the ConsumerInfo.com contract. But that was true because the plaintiff had "not specifically" challenged the delegation clause. *Id.* In the court's view, because the delegation clause was "valid and uncontested," the only question it could consider was "whether a valid arbitration agreement exists." *Id.* at *5. It therefore did not address, let alone consider, any questions regarding

1

2    By:    */s/ Craig C. Marchiando*
     Craig C. Marchiando, Esq., (SBN 283829)
     Leonard A. Bennett, Esq., (*pro hac vice*)
3    **CONSUMER LITIGATION ASSOCIATES, P.C.**
     Four Embarcadero Center, Suite 1400
4    San Francisco, CA 94111
     Telephone: (757) 930-3660
5    Facsimile: (757) 930-3662
     Email: lenbennett@clalegal.com
6    Email: craig@clalegal.com

7    Kristi C. Kelly, Esq. (*pro hac vice*)
     Andrew Guzzo, Esq. (*pro hac vice forthcoming*)
8    **KELLY GUZZO, PLC**
     3925 Chain Bridge Road, Suite 202
9    Fairfax, VA 22030
     (703) 424-7572
10   (703) 591-0167 Facsimile
     Email: kkelly@kellyguzzo.com
11   Email: aguzzo@kellyguzzo.com

12
     *Attorneys for Plaintiffs and the Class*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27
     _____
     Experian's effort to enforce a contract to which it was not a signatory, and whether it could satisfy its
28   burden to establish that it is a third-party beneficiary of the contract.