John A. Vogt (State Bar No. 198677)
JONES DAY
3161 Michelson Drive, Suite 800
Irvine, CA  92612
(T) 949-851-3939
(F) 949-553-7539
javogt@jonesday.com

William R. Taylor (*pro hac vice*)
JONES DAY
717 Texas, Suite 3300
Houston, TX  77002
(T) 832-239-3860
wrtaylor@jonesday.com

Joseph N. Parsons (*pro hac vice*)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA  15219
(T) 412-394-9590
jparsons@jonesday.com

Attorneys for Defendant
Experian Information Solutions, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELETTRA MEEKS, JOSEPH DELACRUZ, STEPHANIE LAGUNA, AMBER LEONARD, and BECKY WITT, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.: MIDWEST RECOVERY SYSTEMS, LLC; and CONSUMER ADJUSTMENT COMPANY, INC.,<br><br>Defendants. | Case No. 3:21-cv-03266-VC<br><br>Assigned to: Judge Vince Chhabria<br><br>**EXPERIAN INFORMATION SOLUTIONS, INC.'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION**<br><br>Date:   September 2, 2021<br>Time:   2:00 p.m.<br>Place:  Courtroom 4 |

**INTRODUCTION**

EIS's motion to compel arbitration has effectively gone unopposed. Plaintiffs do not contest that a case must be compelled to arbitration where: (1) a valid agreement to arbitrate exists; and (2) the arbitration agreement encompasses the claims at issue. *See Chiron Corp. v. Ortho Diagnostic Systems, Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). And here, Plaintiffs concede that they enrolled in CreditWorks<sup>SM</sup> and their subscriptions are governed by a Terms of Use Agreement containing a valid agreement to arbitrate. While Plaintiffs take the curious position that their agreement to arbitrate is simply with EIS's affiliate, Experian Consumer Services ("ECS"), that argument is belied by the terms of the contract that Plaintiffs concededly entered: "For purposes of this arbitration provision, references to 'ECS,' 'you,' and 'us' shall include our respective parent entities, subsidiaries, [and] ***affiliates*** . . . ." (*See* ECF No. 20-1 ("Williams Decl."), Exs. 3, 5, 6, 9, 12, 13 and 15) (emphasis added).) EIS is an affiliate of ECS. (*Id.*, ¶ 2.) Plaintiffs present no contrary evidence. Thus, Plaintiffs agreed to arbitrate with EIS—an affiliate of ECS—and their extended discussion about whether EIS qualifies as a "third party beneficiary" is legally irrelevant. *See*, *e.g.*, *Sanzone-Ortiz v. Aetna Health of California, Inc.*, No. 15-cv-03334-WHO, 2015 WL 9303993, at *6 (N.D. Cal. Dec. 22, 2015) (dismissing plaintiff's argument that defendant was not a party to an arbitration agreement because plaintiff's "limited reading of the agreement ignores that the arbitration provision applies to . . . *affiliates* as well.") (emphasis in original).

That leaves only one remaining question for the Court to address: Whether Plaintiffs' claims fall within the scope of the contract's arbitration agreement? As EIS's motion established, the contract delegates that question to an arbitrator to decide: "***All issues are for the arbitrator to decide*** . . . ." (Williams Decl., Exs. 3, 5, 6, 9, 12, 13 and 15 (emphasis added).) As the Honorable Nitza I. Quiñones Alejandro recently ruled in *Coulter*—under the ***same*** contract at issue here—that broad delegation clause requires all issues concerning arbitrability to be resolved in arbitration. *Coulter v Experian Information Solutions, Inc.*, 2021 WL 735726, at *4-5 (E.D. Pa. Feb. 25, 2021). That unassailable ruling disposes of the remaining arguments presented in Plaintiffs' opposition, as every one of them impermissibly asks this Court to resolve the arbitrability of their claims.

While Plaintiffs contend that, unlike the plaintiff in *Coulter*, they are contesting the

delegation clause, they present no evidence or arguments on the clause's enforceability. Instead, they simply argue that their claims have not been delegated to an arbitrator because, in Plaintiffs' view, they fall outside the scope of the arbitration agreement. Plaintiffs misapprehend the delegation clause. The question of *whether* a claim is outside the scope of the arbitration clause has been delegated to an arbitrator to answer. And, as the Supreme Court held in *Henry Schein*, "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract." *Henry Schein, Inc. v. Archer and White Sales, Inc.*, ---U.S.---, 139 S.Ct. 524, 527-530 (2019). "In those circumstances," the Court admonished, "a court possesses no power to decide the arbitrability issue." *Id*.

Regardless, as EIS's motion demonstrated, even if there had not been a delegation, Plaintiffs' claims plainly are subject to arbitration. The evidence that EIS presented establishes that Plaintiffs would have learned about the existence of their claims through reports they obtained through their CreditWorks$^{SM}$ subscription. (Williams Decl., ¶¶ 8, 13, 18, 24, and 28.) Here too, Plaintiffs do not present *any* contrary evidence. Thus, because the arbitration clause broadly applies to "all" disputes and claims "arising out of" or "relating to" Plaintiffs' use of their CreditWorks$^{SM}$ subscription—words and phrases that the Ninth Circuit has emphasized are "broad and far reaching," *see Chiron*, 207 F.3d at 1131—the claims are subject to arbitration.

For these reasons, EIS respectfully requests that the Court order Plaintiffs' claims to arbitration, and stay this action pending the outcome of arbitration.

## LEGAL ARGUMENT

### I. THERE IS A VALID AGREEMENT TO ARBITRATE

Plaintiffs do not dispute that they enrolled in CreditWorks$^{SM}$ and agreed to the Terms of Use governing that subscription. They also do not dispute that every version of the Terms of Use has a valid agreement to arbitrate. Nor do they dispute that their enrollment in CreditWorks$^{SM}$ preceded the filing of this lawsuit, and that their use of their CreditWorks$^{SM}$ subscriptions has continued even after the current version of the Terms of Use came into effect. Thus, they do not dispute that they are bound by the current version of the Terms of Use. Nor do Plaintiffs present any evidence or argument that any version of the Terms of Use Agreement (or its arbitration clause)

is unenforceable on grounds of unconscionability (or any other contract defense). Accordingly, the Court should find, based upon an undisputed factual record, that: (1) Plaintiffs, by enrolling in CreditWorks<sup>SM</sup>, entered a contract containing a valid agreement to arbitrate, and (2) the operative agreement is the current version of the Terms of Use.

Unable to refute that a valid agreement to arbitrate exists, Plaintiffs focus their opposition solely on the parties who can enforce the arbitration agreement. Plaintiffs say that EIS cannot invoke the arbitration clause in the Terms of Use because EIS's moving papers failed to establish that EIS is a "third party beneficiary" under the contract. (Opp. at 5-6.) The argument lacks merit. Simply put, EIS did not need to show that it is a third party beneficiary because the express language of the contract says that, "[f]or purposes of the arbitration provision, references to 'ECS,' 'you,' and 'us' shall include our respective parent entities, subsidiaries, [and] *affiliates* . . . ." (Williams Decl., Exs. 3, 5, 6, 9, 12, 13 and 15) (emphasis added). It is undisputed that EIS is an affiliate of ECS. (*Id*., ¶ 2.) As a matter of law, EIS is a party to the arbitration agreement, and Plaintiffs expressly agreed to arbitrate their claims against EIS.

Under indistinguishable facts, courts within this Circuit have reached this same conclusion. *Kaselitz v. hiSoft Technology Int'l, Ltd.*, No. C-12-5760 MMC, 2013 WL 622382, at *6-7 (N.D. Cal. Feb. 15, 2013) (compelling arbitration of claims against plaintiffs' employer's affiliate where the agreement's definition of "Company" included affiliates, and therefore, defendant was "a party to the employment agreements, and, consequently, can enforce the arbitration provisions therein."); *Sanzone-Ortiz*, 2015 WL 9303993, at *6 (same); *Ross-Aragon v. BMW of N. Am., LLC*, No. CV 19-2369-DOC-DRM, 2020 WL 2027599, at *2 (C.D. Cal. Feb. 20, 2020) (compelling arbitration of claims against BMW on the basis of an arbitration clause in a lease agreement between plaintiff and a BMW dealership where the lease agreement "explicitly extends to 'affiliates'" and other "third parties."); *Silva v. Butori Corp.*, No. CV-19-04904-PHX-MTL, 2020 WL 2308528, at *3-5 (D. Ariz. May 8, 2020) (compelling arbitration pursuant to an agreement between plaintiff and defendant's affiliate where the agreement expressly included in its definition of "the Company" "all parent, subsidiary, and affiliated entities").

Plaintiffs rely on *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122 (9th Cir. 2013), *see* Opp.

at 4, but that case does not assist them. There, the Ninth Circuit declined to compel arbitration of plaintiffs' claims against Toyota because the arbitration clause was "expressly limited to Plaintiffs and the[ir] Dealerships[.]" *Id*. at 1127. The court concluded that, under the plain language of the contract, Plaintiffs agreed to arbitrate "with the Dealerships and no one else." *Id*. Here, however, the arbitration clause says the exact opposite: Plaintiffs agreed to arbitrate "all disputes and claims" with ECS, which "include[s] [ECS's] . . . parent entities, subsidiaries, [and] **affiliates** . . . ." Plaintiffs would have this Court ignore the plain language of the Terms of Use, which is contrary to basic principles of contract interpretation and the standard of review under the Federal Arbitration Act. *See Volt Info. Scis., Inc. v. Bd. of Tr. of Leland Stanford Junior Univ.*, 498 U.S. 468, 478 (1989) (FAA "requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms."); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) (Courts "must resolve 'any doubts concerning the scope of arbitrable issues … in favor of arbitration.").

Plaintiffs' reliance on *Revitch v. DIRECTV, LLC*, 977 F.3d 713 (9th Cir. 2020), *see* Opp. at 4-5, 9-10, 12, 14-15, also is misplaced. A cursory examination of that decision reveals that it bears no resemblance to the matter at hand. In *Revitch*, the Ninth Circuit held that DIRECTV, which had become an affiliate of AT&T by the time of the lawsuit, was not permitted to compel arbitration of Telephone Consumer Protection Act claims pursuant to an arbitration clause in a seven-year-old wireless services agreement between the plaintiff and AT&T. 977 F.3d at 716-18. The Ninth Circuit expressed concern with the "absurd results" of compelling a plaintiff "to arbitrate any dispute with any corporate entity that happens to be acquired by AT&T, Inc., even if neither the entity nor the dispute has anything to do with providing wireless services to [the plaintiff]—and even if the entity becomes an affiliate years or decades in the future." *Id*. at 717. As a result, the Court held that "[w]hen [plaintiff] signed his wireless services agreement with [AT&T] so that he could obtain cell phone services, he could not reasonably have expected that he would be forced to arbitrate an unrelated dispute with DIRECTV, a satellite television provider that would not become affiliated with AT&T until years later." *Id*.

Unlike in *Revitch*, Plaintiffs do not dispute that EIS is an affiliate of ECS at the time that

1    they enrolled in CreditWorks<sup>SM</sup> and agreed to be bound by the Terms of Use.  Indeed, unlike in

2    *Revitch*, EIS is **specifically referenced** in the Terms of Use, and Plaintiffs are admonished that,

3    under the contract, ECS may provide information to EIS, which "may be used and stored by [EIS]

4    for any purposes lawfully permitted by the FCRA . . . to the same extent as any other information

5    furnished to [EIS] for inclusion in your Experian credit file."  (*See*, *e.g.*, Williams Decl., Ex. 6 at

6    64.)  Thus, compelling arbitration of Plaintiffs' claims against EIS does not give rise to the unique

7    "absurdity" that concerned the Ninth Circuit in *Revitch*.  Indeed, in *Revitch*, the Ninth Circuit noted

8    that, "[h]ad the wireless services agreement stated that 'AT&T' refers to 'any affiliates, both present

9    and future,' we might arrive at a different conclusion." *Id*. at 718.  The ordinary meaning of the

10   word "affiliates" certainly includes ECS's then-present affiliates, such as EIS.  (*See, e.g.,* Williams

11   Decl., ¶ 2 ("ECS and EIS are both wholly-owned subsidiaries of Experian Holdings, Inc., and the

12   parent company is Experian plc."); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th

13   Cir. 2009) (noting that "affiliate" means, among other things, a company "associated with others

14   under common ownership or control.").  Any other interpretation would render the agreement's

15   inclusion of "affiliates" within the definition of "ECS" completely meaningless and thus

16   superfluous.  Without the unique prospect of the "absurd results" that existed in *Revitch*, the Court

17   must "determine the mutual intention of the parties 'from the written terms [of the contract]

18   alone…". *Revitch*, 977 F.3d at 717.  Here, the written terms clearly and explicitly make EIS a party

19   to the arbitration agreement.

20   Because the record evidence plainly demonstrates that EIS is a party to the arbitration clause

21   in the Terms of Use, Plaintiffs' extended argument disputing the third-party beneficiary status of

22   EIS, *see* Opp. at 5-15, is irrelevant.  *See*, *e.g.*, *Thomas v. Wells Fargo Dealer Servs.*, No. CV 13-

23   5168-RGK, 2013 WL 12114768, at *3 (C.D. Cal. Oct. 1, 2013) (holding that assignee "was not,

24   and need not be, an intended third-party beneficiary as the Plaintiff claims.  As the assignee, Wells

25   has the same rights the [signatory] would have had to enforce the [agreement] – including its

26   Arbitration Clause."); *see also Jackmon v. America's Servicing Co.*, No. C 11-03884 CRB, 2011

27   WL 3667478, at * (N.D. Cal. Aug. 22, 2011) ("Defendants' arguments regarding the problem with

28   third party beneficiary claims . . . are inapplicable because Plaintiff need not rely on the third party

beneficiary theory. Plaintiff provides some evidence of a direct contract between [defendant] and herself in the documents attached to her declaration . . . ."). In short, a valid agreement to arbitrate between EIS and Plaintiffs exists, and this Court should so find.

## II. WHETHER PLAINTIFFS' CLAIMS ARE ARBITRABLE IS FOR AN ARBITRATOR TO DECIDE

The balance of Plaintiffs' opposition is devoted to establishing that their claims are not arbitrable. The arguments are legally irrelevant and factually incorrect.

First, Plaintiffs' contention that the Court can decide the question of arbitrability, *see* Opp. at 14-15, is foreclosed by controlling Supreme Court precedent, *see Henry Schein*, 139 S.Ct. at 527-530, as well as the plain language of the Terms of Use Agreement. Whether a dispute is arbitrable is decided by a court only if the parties have not contracted to have arbitrability issues decided by an arbitrator. *Henry Schein*, 139 S.Ct. at 527-30. Here, the Terms of Use Agreement clearly and unmistakably delegates questions of arbitrability to the arbitrator: "***All issues*** are for the arbitrator to decide, ***including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions*** . . . ." (Williams Decl., Exs. 3, 5, 6, 9, 12, 13, and 15 (emphases added); *see also id.* (admonishing that an "arbitrator shall have ***exclusive authority*** to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement including, but not limited to any claim that all or any part of this arbitration provision . . . .").) Where "the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract … even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein*, 139 S.Ct. at 529. Plaintiffs try to sidestep this binding precedent by repeating the argument that EIS is not a party to the arbitration agreement. But as shown, that argument is contradicted by the express language of the agreement, and is barred by relevant Circuit law precedent.

Plaintiffs also fail to distinguish this case from *Coulter*, where Judge Alejandro held that the ***same*** arbitration clause in the ***same*** contract "constitutes a 'clear and unmistakable' delegation clause under *Henry Schein* and delegates the exclusive authority to resolve 'all issues' to the arbitrator, including the 'scope and enforceability' of the Arbitration Provision." 2021 WL 735726,

at *4. Indeed, Plaintiffs relegate their entire opposition on the applicability of *Coulter* to a single footnote, contending that this case is somehow different because, in *Coulter*, "the plaintiff had 'not specifically' challenged the delegation clause," and here, they argue that EIS cannot "enforce a contract to which it was not a signatory," and that it cannot "satisfy its burden to establish that it is a third-party beneficiary of the contract." (Opp. at 15 n.8.) To start, as already established, the contract expressly allows EIS—as an affiliate of ECS—to enforce the arbitration clause; it did not need to show that it is a "third-party beneficiary." Furthermore, while the plaintiff in *Coulter* did not challenge the validity and enforceability of the delegation clause, **neither do Plaintiffs here**. In fact, just like the plaintiff in *Coulter*, the Plaintiffs do not argue that the delegation clause is unenforceable or invalid in any way. *See Coulter*, 2021 WL 735726 at *4 ("If the delegation clause includes the enforceability of the arbitration provision, a court cannot consider the question of enforceability 'unless a party challenged the delegation clause and the court concludes that the delegation clause is not enforceable.' [Citation] A party seeking to avoid arbitration under those circumstances must 'challenge the delegation provision specifically.'"). Indeed, the arguments presented in Plaintiffs' opposition are confined to (1) whether EIS may compel arbitration as an affiliate of ECS, and (2) whether Plaintiffs' claims fall within the scope of the arbitration agreement. Thus, this case is indistinguishable from *Coulter*.

<u>Second</u>, Plaintiffs' extended discussion regarding why they believe arbitration of their claims is, for various reasons, "inconsistent with the intent of the parties," *see* Opp. at 6-14, goes to the arbitrability of their claims which, again, has been delegated to an arbitrator to decide. Regardless, their arguments are unmeritorious. To start, Plaintiffs offer no rebuttal to the record evidence before the Court that they learned the facts giving rise to their claims against EIS through the use of their CreditWorks[SM] memberships. (*See* Williams Decl., ¶¶ 8, 13, 18, 24, and 28.) In fact, Plaintiffs concede that "the evidence shows . . . that Plaintiffs were interested in the services provided by ConsumerInfo.com, including accessing 'credit report(s), credit risk score(s), credit monitoring, credit score monitoring and credit score tracking. . . .'" (Opp. at 13 (citing Williams Decl., Ex. 6).) Those are the very services Plaintiffs utilized to learn how EIS was reporting the loans and "date of first delinquency" that are the subject of this lawsuit. Because the arbitration

1  clause broadly encompasses "all disputes and claims between us directly relating to the provision
2  of any Service and/or your use of any Website"—and Plaintiffs' claims plainly "relat[e] to" their
3  "use of" CreditWorks[SM]—they are subject to arbitration.  To be sure, the two-year statute of
4  limitations under the Fair Credit Reporting Act is triggered on the date of discovery of an alleged
5  violation.  *See* 15 U.S.C. § 1681p; *Willey v. J.P. Morgan Chase, N.A.*, No. 09 Civ. 1397(CM), 2009
6  WL 1938987, at *4-5 (S.D.N.Y. July 7, 2009).  Thus, the information Plaintiffs obtained through
7  their use of CreditWorks[SM] will limit the scope of their claims.  In other words, their use of
8  CreditWorks[SM] is "directly relate[d] to" their claims."

9        Plaintiffs' contention that compelling arbitration of their claims "hands [EIS] the right to
10  invoke the arbitration contract for unrelated claims," *see* Opp. at 9-10, is not well-taken.  To start,
11  the argument goes to arbitrability.  Regardless, their claims are not "unrelated" to their use of the
12  services or websites.  Indeed, by their silence in the face of EIS's evidence, they concede that they
13  discovered the basis of their claims through their use of CreditWorks[SM].  Equally unmeritorious is
14  Plaintiffs' companion argument—that "every customer who signed this contract would have agreed
15  to arbitrate every dispute it ever had with a nearly limitless set of entities even if the customer had
16  only visited CustomerInfo.com's site once."  (*Id*. at 10-12.)  The contract does not require
17  arbitration of "every" dispute.  Instead, the agreement requires arbitration of disputes that relate to
18  or arise out of the service, which Plaintiffs' claims plainly do.  Furthermore, there is no evidence
19  that, at the time Plaintiffs enrolled, there was a "near[] limitless" number of entities that could
20  invoke the arbitration clause.  Indeed, as noted, EIS is specifically called out in the contract, and
21  Plaintiffs expressly agreed that, under the Terms of Use, ECS may share information with
22  EIS, which then "may be used and stored by [EIS] for any purposes lawfully permitted by the
23  FCRA . . . to the same extent as any other information furnished to [EIS] for inclusion in [their]
24  Experian credit file."  (*See*, *e.g.*, Williams Decl., Ex. 6 at 64.)

25        None of the cases that Plaintiffs rely upon are remotely relevant to the facts at hand.
26  *Revitch* declined to hold that plaintiff is required to "arbitrate any dispute with any corporate entity
27  that happens to be acquired by AT&T, Inc., even if neither the entity nor the dispute has anything
28  to do with providing wireless services to Revitch—and even if the entity becomes an affiliate years

1  or even decades in the future." 977 F.3d at 717.  That is obviously not the case here.  EIS is an
2  affiliate of ECS; is specifically called out in the agreement; and provides services to ECS under the
3  agreement.  (*See*, *e.g.*, Williams Decl., Ex. 6 at 64 (explaining that ECS will obtain information
4  from EIS to provide the services under the contract).)  Equally irrelevant is *Calderon v. Sixt Rent a*
5  *Car, LLC*, --- F.4th ---, 2021 WL 2946428 (11th Cir. July 14, 2021).  There, the Eleventh Circuit
6  declined to hold that "every customer who signed Orbitz's Terms of Use would have agreed to
7  arbitrate every dispute it ever had with *any* 'travel supplier[]' or *any* 'compan[y] offering products
8  or services through Orbitz, regardless of whether the customer booked his reservations with that
9  entity through Orbitz." *Id*. at *4 (emphasis in original).  Here, EIS is not a stranger to the contract.
10 It is an affiliate of ECS; the contract provides that ECS will obtain information from EIS to provide
11 the services; and Plaintiffs learned of their claims against EIS through their use of CreditWorks[SM].

12  Plaintiffs also misstate the arbitration clause, arguing that it applies only to claims "*directly*
13 *related to*" the contract.  (Opp. at 6-7 (emphasis in original).)  Plaintiffs ignore the rest of the clause,
14 which provides, in no uncertain terms, that "[t]his agreement to arbitrate is intended to be broadly
15 interpreted and to make all disputes and claims between us directly relating to the provision of any
16 Service and/or your use of any Website subject to arbitration to the fullest extent permitted by law."
17 (Williams Decl., Exs. 3, 5, 6, 9, 12, 13, and 15.)  They also ignore the admonition that the agreement
18 to arbitrate extends to "claims arising out of or relating to any aspect of the relationship between us
19 arising out of any Service or Website, whether based in contract, tort, statute (including, without
20 limitation, the Credit Repair Organizations Act) fraud, misrepresentation or any other legal theory."
21 (*Id*.)  And they also ignore Ninth Circuit precedent that treats the phrases "arising out of" and
22 "relating to" in an arbitration clause as "broad and far reaching." *Chiron*, 207 F.3d at 1131.  Instead,
23 Plaintiffs cite *Reading Health Sys. v. Bear Stearns Co.*, 900 F.3d 87, 99 (3d Cir. 2018), *see* Opp. at
24 7-8, but that case does not assist them.  Indeed, in *Reading*, the court specifically distinguishes
25 clauses that are limited to "arising out of" from those, like this one, that also encompass disputes
26 that broadly "relate to" the agreement.  *Id*. at 98, n.50.[1]

---

[1] Subsequent Third Circuit jurisprudence confirms that "[c]ourts have generally read the terms 'arising out of' or 'relating to' [in] a contract as indicative of an 'extremely broad' agreement

<u>Third</u>, Plaintiffs' contention that "the parties did not intend to arbitrate FCRA claims," based on a FCRA carve-out that existed in a 2018 version of the Terms of Use, is immaterial. As explained in *Coulter*, that argument goes to arbitrability. *Coulter*, 2021 WL 735726 at *4-5. Regardless, with the exception of Plaintiff Meeks, every version of the Terms of Use that was in effect when Plaintiffs enrolled did ***not*** have a carve-out for FCRA claims. (Williams Decl., Exs. 3, 5, 6, 9, 12, 13, and 15.) Thereafter, a FCRA carve-out was ***never*** added. (*Id*.) And, with regard to Plaintiff Meeks, it is undisputed that the Terms of Use in effect when she enrolled—and all subsequent versions—admonished that"[e]ach time you order, access or use any of the Services or Websites, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement." (*Id*.) It is also undisputed that ***all*** Plaintiffs (including Ms. Meeks) continuously used their subscription after the current version of the Terms of Use came into effect which, again, contains no FCRA carve-out. (*Id*., ¶¶ 6, 11, 16, 22, and 26; Ex. 6.) While the Terms of Use provides that "no unilateral amendment will retroactively modify the parties' agreed-to dispute resolution provisions of this Agreement for ***then-pending disputes*** unless the parties expressly agree otherwise in writing," *id*. Exs. 3, 5, 6, 9, 12, 13, and 15 (emphasis added), this suit was not filed until May 3, 2021—***years after*** the FCRA carve-out was removed. (*Id*.)[2]

## CONCLUSION

A valid agreement to arbitrate exists between EIS and Plaintiffs and, even though the question of whether Plaintiffs' claims are arbitrable has been delegated to an arbitrator to decide, the claims plainly fall within the scope of the broadly-worded arbitration clause. Thus, the Court should compel this matter to arbitration, and stay this case, pursuant to Section 3 of the FAA, until arbitration has been concluded.

---

to arbitrate any dispute relating in any way to the contract. [Citation] Such broad clauses have been construed to require arbitration of any dispute between the contracting parties that is connected in any way with their contract." *In re Remicade Antitrust Litigation*, 938 F.3d 515, 525 (3d Cir. 2019).

[2] Moreover, if Plaintiff Meeks did not wish to be bound by that amendment, the Terms of Use allowed her to opt out of that change "prior to initiating [her] dispute." (*See* Williams Decl, Exs. 3, 5, 6, 9, 12, 13, and 15). She indisputably never did so. (*Id*., ¶ 7.)

Dated:  August 16, 2021

Respectfully submitted,

JONES DAY

By: _____
John A. Vogt

Attorney for Defendant
Experian Information Solutions, Inc.